# COMPOSITE EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
**(Cite as: 2010 WL 4892646 (S.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
HO MYUNG MOOLSAN, CO. LTD., Plaintiff,
v.
MANITOU MINERAL WATER, INC., Defendant.

No. 07 Civ. 07483(RJH).
Dec. 2, 2010.

### MEMORANDUM OPINION AND ORDER
RICHARD J. HOLWELL, District Judge.

*1 Plaintiff, Ho Myung Moolsan ("Moolsan"), a South Korean mineral water reseller, brought this breach of contract action against defendant Manitou Mineral Water ("Manitou"), a mineral water manufacturer based out of Colorado and New York. At trial ending November 1, 2010, a unanimous jury returned a verdict for defendant on liability for all claims. This opinion sets forth the Court's reasoning for the following rulings made before and during trial:

1. Prior to trial, plaintiff alleged that the United Nations Convention on Contracts for the International Sale of Goods applied to this action. Because the parties consented by their litigation conduct to apply New York law, the Court applied New York law to the case.

2. Plaintiff alleged that the contract in question was an output contract. Defendant countered that the contract was an installment contract. Because the Court found that the contract authorized delivery by separate lots, the Court agreed with defendant that the contract was an installment contract.

3. Prior to trial, defendant moved *in limine* to preclude plaintiff from introducing the testimony or report of their damages expert, Don Smith. Smith's report calculated plaintiff's lost profits to be over $133 million. Because the report was speculative and unreliable, usurped the role of the jury, or was not a proper subject for expert testimony, the Court excluded the report and precluded Smith from testifying.

4. At trial, defendant objected to plaintiff's offer of PX 90A.14. This exhibit consisted of documents purportedly summarizing plaintiff's sales activity in Korea. Because the offered documents were admittedly created not during the period of sales but instead after litigation began and were inherently unreliable, and because underlying documents allegedly establishing sales were in existence but never produced during discovery, the Court excluded PX 90A.14.

5. At the close of plaintiff's case, defendant moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law that plaintiff could not establish lost profits. Because plaintiff presented no admissible expert testimony going to lost profits and because plaintiff's remaining documents going to lost profits (PX 90A.15) were speculative and unreliable sales projections, the Court ruled that plaintiff could not establish lost profits.

6. Faced with the Court's ruling that it could not recover lost profits, plaintiff sought to recover those precluded damages as "lost sales." Because the Court could find no authority distinguishing the two for the purpose of plaintiff's damages claim, the Court ruled that plaintiff could not recover "lost sales."

7. Plaintiff sought to recover, as compensatory damages, $500,000 it allegedly paid and lost under the contract but that defendant claimed it never received. Because that $500,000 loss was not proximately caused by defendant's breach of contract, the Court precluded plaintiff from seeking to recover that $500,000 from defendant.

*2 8. During defendant's case, plaintiff moved to amend its complaint under Federal Rules of Civil Procedure 15(a) and 15(b) to add claims for fraud in the inducement of the contract and for negligent misrepresentation. Because these issues were not raised in the pleadings or pre-trial order, were not tried with the parties' consent, and had already been disposed of, and because any amendment would have been futile, the motion was denied.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
**(Cite as: 2010 WL 4892646 (S.D.N.Y.))**

## DISCUSSION
### I. New York Law Applies To This Action

Plaintiff filed its initial six count complaint on August 20, 2007. (Compl. at 14.) The relevant count for breach of contract was explicitly brought [u]nder [s]tate [l]aw. (Compl. at 11.) In unsuccessfully seeking a preliminary injunction, plaintiff relied exclusively on New York law. (*See, e.g.,* Pl.s Mem. dated Oct. 10, 2007.) And on appeal of this Courts denial of its motion for a preliminary injunction, plaintiff again relied upon New York law. *See Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.,* 316 Fed. Appx. 40 (2d Cir.2009). Thereafter, plaintiff was granted leave to amend its complaint and, once again, alleged breach of contract "[u]nder [s]tate [l]aw." (First Amend. Compl. at 15.) Nevertheless, following the close of discovery, plaintiff moved for summary judgment on its amended complaint, alleging for the first time that the United Nations Convention on Contracts for the International Sale of Goods (CISG) governed the dispute. (Pl.s Mot. for Summ. J. dated Dec. 30, 2009, attach. 2 at 6–7.) On June 29, 2010, the Court, applying New York law denied plaintiffs motion and granted defendants motion for summary judgment on all claims except for plaintiffs breach of contract claim. (Order of June 25, 2010 at 1–2.)

In its proposed final pretrial order, plaintiff again asserted that the CISG applied. Defendant objected, arguing that plaintiff had consented to the application of New York law. Defendant cited *Walter E. Heller Co. v. Video Innovations, Inc.,* 730 F.2d 50 (2d Cir.1984) to support this contention. That case found that though a lease stated it was to be interpreted under Illinois law, the district courts application of New York law was not error because in the court below and in their original briefs in this Court, the parties relied primarily upon New York authorities to support their respective contentions. *Video Innovations,* 730 F.2d at 52. In other words, the parties to litigation [had] consent[ed] by their conduct to the law to be applied [namely, New York law despite the contracts Illinois choice of law clause]. *Id.; see also In re Cross Media Marketing Corp.,* 367 B.R. 435, 453 (Bankr.S.D.N.Y.2007) (finding New York law consented to on all of the state law causes of action alleged [because] [n]one of the parties raised any choice of law issues in the pleadings [and] ... [f]or the most part, the parties briefed the issues applying New York law.).

The Court applied New York law to this dispute because, as demonstrated above, plaintiff had relied exclusively on New York law, and not the CISG, until after the close of discovery. Most importantly, plaintiff alleged, and retained after amending its pleading, a claim for Breach of Supply Agreement *Under State Law.* (Compl. at 11 (emphasis added); First Amend Compl. at 15 (emphasis added).) While application of the CISG may have been appropriate, plaintiff by its actions had consented to the application of the N.Y.U.C.C. and it was far too late to withdraw that consent without undue prejudice to defendant. Moreover, as plaintiff expressly admitted that the CISG and the N.Y.U.C.C. were in all material respects the same, and that the only difference was in the notice requirement before bringing suit, (Tr. of Hrg of Oct. 21, 2010 at 12), it seems that even had the Court applied the CISG, the course of the case would not have changed.

### II. The Contract Was An Installment Contract

*3 The parties signed a contract for the sale of mineral water on December 1, 2005. (Def.s Trial Ex. 1) Under the Contract, defendant agreed to sell a distribution right for its mineral water to plaintiff for $500,000 and agreed to sell mineral water to plaintiff at $1 per one-liter bottle. (*Id.* 3, 5.) Plaintiff also made an advance payment of $1 million for mineral water inventory. (*Id.* 3.) The contract was to run for five years. (*Id.* 4.) After the first year, plaintiff was required to make minimum yearly orders of $1 million worth of water. (*Id.*) Plaintiff was additionally required to place its orders, in writing, normally 3 months in advance. (*Id.* 5.) And payment on orders was also to be made in advance. (*Id.* 4) Plaintiff argued that this writing constituted an output contract while defendant argued it was an installment contract.

Generally, a contract is void under the Uniform Commercial Code if it does not specify a quantity term. N.Y.U.C.C. 2–201 cmt. 1. A minimum quantity term, like the $1 million minimum for years two-through-five in the contract in question in this case, is satisfactory. *Corning Inc. v. VWR Int'l, Inc.,* No. 05–CV–6532 CJS, 2007 WL 841780, at *6 (W.D.N.Y.2007) (citing *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 749 (2d Cir.1998)). When a contract contains a quantity term but allows for delivery in separate lots separately

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
(Cite as: 2010 WL 4892646 (S.D.N.Y.))

accepted, it is an installment contract. N.Y.U.C.C. 2–612(1); *Stinnes Interoil, Inc. v. Apex Oil Co.,* 604 F.Supp. 978, 979–81 (S.D.N.Y.1985). A breach of the entire contract occurs only when a non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract. N.Y.U.C.C. 2–612(3). This standard for determining breach differs from that for single-lot contracts in that, for the latter, if the goods or the tender of delivery fail in any way to conform to the contract, a breach has occurred and a buyer may reject the goods and cease performing under the contract. N.Y.U.C.C. 2–601; *Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Finance Corp.,* 567 F.Supp.2d 579, 592 n.93 (S.D.N.Y.2008). Additionally, a breach of an individual installment occurs when the default in question substantially reduces or impairs the value, to the buyer, of that shipment. *Arkla Energy Resources v. Roye Realty Developing Corp.,* 9 F.3d 855, 862–63 (10th Cir.1993); 15 Williston on Contracts 45:22.

As this district has recognized, the definition of an installment contract includes coverage of installment deliveries tacitly authorized by the circumstances or by the option of either party. N .Y.U.C.C. 2–612 cmt. 1; *see Fashionwear (PVT) Ltd. v. Regatta (U.S.A.) LLC,* No. 03 Civ. 5597(JFK), 2006 WL 695256, at *3 n.1 (S.D.N.Y. March 17, 2006). Each delivery of a separate lot need not even be separately paid for. N.Y.U.C.C. 2–612 N.Y. annot. 1. Additionally, a contract that:

> provides that deliveries are to be made only at times authorized and chosen by the buyer, without specifying the times for delivery, may also properly be treated as an installment contract under the Code ... since the uncertainty of when and if the buyer will request delivery does not change the essential character of the contract.

*4 15 Williston on Contracts 45:2 (4th ed.2010). Finally, the lack of a regular shipment schedule does not preclude a contracts characterization as an installment contract. *Id.*

Contracts that lack quantity terms but instead specify quantity based on the output of a seller, on the other hand, are also valid. N.Y.U.C.C. 2–306(1) An output contract is one that measures quantity by the output of the seller ... as may occur in good faith, except that no quantity unreasonably disproportionate to any ... normal or otherwise comparable prior output ... may be tendered or demanded. *Id.;* 3 Williston on Contracts 7:12 (4th ed. 2010) ( [A]greements by a seller to sell all the goods or services he may produce to a buyer in exchange for the buyers agreement to purchase them are known as output contracts. Because the quantity term of an output contract varies, the test to determine breach centers on the parties good faith in producing or accepting amounts of the product in question. *See* N.Y.U.C.C. 2–306 cmt. 3.

The contract at issue in this case is clearly not an output contract. Defendants output does not set the contracts quantity term and defendant was not entitled to force plaintiff to accept shipments of water beyond the minimum one million bottles required to be purchased each year after the first. Moreover, the fact that defendant was likely to allocate virtually all of its capacity to filling plaintiffs orders, at least until year two when a second production line was installed, does not create an output contract in the absence of an enforceable obligation by plaintiff to accept defendants production.

The contract here is a hybrid installment-requirements contract. In the first year no minimum quantity of orders was required and the contract contained no quantity term. Instead, as both parties stated in deposition testimony, the contract called for defendant to fill whatever quantities plaintiff ordered. (Kim Dep. at 163, 171–173; Kwon Dep. at 67.) Thus in the first year the contract was a requirements contract. However, the contract's first year ended on December 1, 2006 and the alleged breach in this case occurred in the spring of 2007. After the first year, the contract required a minimum quantity of orders of $1 million worth of water every year. In other words, during the operative period, the contract did contain a quantity term. Because delivery would only follow separate advance orders, placed by plaintiff at its discretion, after the first year the contract was an installment contract.

### III. The Smith Report Was Inadmissible

Plaintiff retained Don Smith, president of American Consulting Group, as an expert to opine on several points of contract interpretation as well as on plaintiffs measure of damages. (Pl.s Original Trial Ex. 90 (Smith Report or the Report) at 2.) Smiths Report concluded that plaintiff was not required to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
(Cite as: 2010 WL 4892646 (S.D.N.Y.))

send formal purchase orders to defendant; that the contract was an exclusive output contract; that defendant violated plaintiffs exclusivity and trademark rights; that plaintiff did not require defendant to ship it half-liter bottles of water (as opposed to liter bottles); and that plaintiff suffered over $133 million lost profits due to defendants breach. (*Id.* at 3–9.) Defendant contended that the first and second conclusions reached questions of contract interpretation improper for expert testimony; that the third conclusion was a legal opinion also improper for expert testimony; that the fourth conclusion was a question of fact to be decided by the jury; and that the fifth conclusion was based on unsupported speculative assumptions. (Def.s Mot. In Limine To Exclude The Testimony of Don Smith dated Sept. 20, 2010 (Def.s Smith Motion) at 4–6.) Plaintiff responded that the credibility of Smiths damages calculation was for the jury to decide and that his other conclusions were simply the facts upon which Smith relied to reach his damages calculation. (Pl.s Oppn To Def.s Motion To Exclude Testimony Of Don Smith dated Sept. 27, 2010 (Pl.s Mot. In Limine Oppn) at 3.)

**\*5** Rule 702 provides:

[If] specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Moreover, testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Fed.R.Evid. 704(a).

District court judges must ensure the reliability and relevancy of expert testimony. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999). Relevance turns on whether the testimony would assist the trier of fact in determining whether some consequential fact is more or less probable. Fed.R.Evid. 401; *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591 (1993) (explaining that a study of the moons phases might help determine whether a certain night was dark but not whether someone was unusually disposed to behave irrationally).

To ensure reliability the court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire,* 526 U.S. at 152. The court has broad discretion regarding both *whether* testimony is reliable and *how* to test that testimonys reliability. *Id.* The district court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case. Fed.R.Evid. 702 Advisory Committees Note. At the same time, Rule 702 is not meant to exclude all imperfect expert testimony; [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *Daubert,* 509 U.S. at 596. However, [t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. Fed.R.Evid. 702 Advisory Committees Note. Finally, expert testimony must not simply address lay matters which the jury is capable of understanding on its own. *In re Fosamax Products Liability Litig.,* 645 F.Supp.2d 164, 173 (S.D.N.Y.2009) ( [T]he testimony is not helpful if it usurp [s] ... the role of the jury in applying [the] law to the facts before it.) (internal quotation marks and citation omitted); *see also United States v. Mejia,* 545 F.3d 179, 194 (2d. Cir2008) (Testimony is properly characterized as expert only if it concerns matters that the average juror is not capable of understanding on his or her own.); *United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir.1994) (A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the experts testimony is not beyond the ken of the average juror.)

**A. Smiths First Four Opinions Were Inadmissible**
**\*6** Smiths first opinion was that the contract did not require plaintiff to place separate and formal orders for mineral water shipments. (Smith Report at 3.) Smiths evidence supporting that opinion was (1) that the contract provided for shipments of one mil-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
(Cite as: 2010 WL 4892646 (S.D.N.Y.))

lion bottles per year; (2) that defendant had already been paid for one million bottles; (3) that defendant was behind in their contractually-defined shipments; (4) that defendant was frequently informed of the need for more shipments; (5) that plaintiff expected monthly shipments of 83,000 bottles; (6) that defendant did not provide those shipments; and (7) that plaintiffs president was frustrated. (*Id.* at 3–4.)

The contract states:

4) [Plaintiff] will have contract period of 5 years. After 1 year from the business commencement, orders for one million dollar or more must be placed, each year. As a general rule, inventory payment of [defendants] Water will be paid in advance.

5) [Plaintiff] will need to place its orders, in writing, normally 3 months in advance. Ex-factory price is determined at U.S. $1 per 1L bottle.

(Def.s Trial Ex. 1.) Smiths contention that defendant was behind its contractually-defined shipments was thus baseless; the contract defines no shipment requirement. As to the remaining contentions, evaluating their truth requires no specialized knowledge and such evidence was therefore not the proper subject of expert testimony. The determinations of whether defendant was informed of the need for more shipments, whether plaintiff expected more shipments, or whether plaintiffs president was frustrated by the lack of more shipments did not require the assistance of an expert on contract construction. These were factual issues that were to be determined by evaluation of the evidence and witnesses at trial. Because the opinion misstated facts as well as usurped the jurys role, Smiths testimony on this point was excluded.

Smiths second opinion, that the contract required exclusive dealing and provision to plaintiff of 100 percent of factory output, (Smith Report at 5), was also excluded. His factual basis for the opinion, language in the earlier 2004 contracts that the Court ruled were admissible only to provide background, did not exist. Despite Smiths claim that they did, none of the contracts in question contained the word exclusive, any word derived therefrom, or any language of exclusivity. (*See* Pl.s Trial Ex. 2, Pl.s Trial Ex. 3, Def.s Trial Ex. 1.) Because Smiths first and second pieces of evidence as to why the contracts created exclusive dealerships for 100 percent output were predicated on indisputably false claims, that evidence could not bolster his conclusions reliability.

Smiths third element of evidence was his contention that paying cash to obtain a distributorship strongly supports that plaintiffs were the exclusive distributor and/or had a 100 output contract. (Smith Report at 53). This statement, however, based solely on Smiths experience and expertise, (*Id.* at 53 n.10), could not be accepted as reliable. The entirely unsupported statement demonstrated no intellectual rigor and was not grounded in any authority. The Report provided no basis for testing the statement other than the Courts own research and the Court could find no law saying that merely paying money to obtain a distributorship creates an exclusive distributorship and/or a 100 percent output contract.

*7 Smiths fourth piece of evidence was defense counsels admission that, as a practical matter, almost 100 percent of output would be sold to plaintiffs. (*Id.* at 54.) That admission, however, was entirely mischaracterized. Defense counsel was explaining that *despite that* virtually 100 percent of output would be allocated to the contract, the contract *was not* an output contract and *did not* require exclusivity. (Tr. of Conference of Oct. 22, 2007 at 12.)

Smiths third opinion was that defendant violated plaintiffs exclusivity and trademark rights. (*Id.* at 6–7.) As to the exclusivity rights, Smiths opinion was entirely predicated on the fact, (Pl.s Mot. In Limine Oppn at 3), that the contract created an exclusive distributorship. (Smith Report at 6.) Considering, as demonstrated above, that Smiths opinion that that relationship existed was unfounded, this opinion also lacked reliability. As to the trademark rights, how advertisements in New Jersey affected water sales in Korea was unclear. (*See Id.* at 7.) [FN1] However, should it have been true that defendant used plaintiffs trademark in some unlawful manner, then an experts opinion as to whether that infringement cost plaintiff sales might have been relevant to plaintiffs measure of damages. But because the Court found that Smiths fifth opinion, that placing plaintiffs economic loss at $133 million, was unreliable, the Court excluded this testimony as well. Any relevance the evidence had on damages could easily have come in through fact witnesses.[FN2]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
**(Cite as: 2010 WL 4892646 (S.D.N.Y.))**

> FN1. The pages of deposition testimony cited by Smith were not provided in any submission from either party.
>
> FN2. Defendant of course was not being sued for trademark infringement but for breach of contract.

Smiths fourth opinion that plaintiff did not demand that defendant provide half-liter bottles instead of full-liter bottles was also excluded. (Smith Report at 8.) The opinion was based entirely on examinations of plaintiffs sales and marketing plans and of deposition testimony. (*Id.*) Reaching it required no specialized knowledge and usurped the jurys role as fact-finder. *See Fosamax,* 645 F.Supp.2d at 173. Furthermore, an expert witness is prohibited from testifying on matters beyond the scope of the expertise for which he was retained because of the obvious danger of wrongly swaying the jury. *See Mejia,* 545 F.3d at 192. Smith was retained to opine on contract construction, marketing, and economic loss issues. The questions whether plaintiff did or did not make this request, and how strong that request was or was not, were irrelevant to those opinions.

**B. Smiths Damages Calculation Was Excluded**

Smiths final opinion was that plaintiff suffered $133,293,878 in economic losses due to defendants breach. (Smith Report at 9.) Each bit of evidence Smith cited in reaching that figure was, however, speculative, contradictory, or unreliable.

First, Smith assumed (1) that plaintiffs shipment requirements would increase from one million per year in the first year to three million in the fifth, and (2) that the parties would have renewed the contract for five additional years. Smith had no evidence whatsoever that the contract would be so renewed, and Smiths opinion on the shipment increase contradicted his evidence for his first opinion that formal purchase orders were not necessary (that being that the contract called for a shipment requirement of exactly one million bottles per year). (*Id.* at 3, 9.) Second, Smiths anticipation of demand growth from one to three million bottles of water per year was doubtful when of the around 300,000 bottles provided under the contract in the first year, only half were actually sold while the other half were given away for free, and sales were made only by salesmen going door-to-door. (Dep. of Jeong Hee Kim, President of Ho Myung Moolsan, dated August 20, 2008 at 110–12.) Third, Smiths allegation that after achieving this success in Korea plaintiff would take the mineral water markets of the United States and Mexico by storm was supported by no cited authority and seemed unreasonable considering the weakness of plaintiffs sales in Korea. (Smith Report at 11.) Fourth, as a start-up company pursuing a new business venture, [e]vidence of lost profits ... receives greater scrutiny because there is no track record upon which to base an estimate. *Schonfeld v. Hilliard,* 218 F.3d 164, 172 (2d Cir.2000). Indeed, lost profits calculations for new ventures that rest on a series of assumptions and projections are generally unreliable. *See Dupont Flooring Systems, Inc. v. Discovery Zone Inc.,* No. 98 Civ. 5101(SHS), 2004 WL 1574629, at *7 (S.D.N.Y. July 14, 2004).[FN3]

> FN3. The critical newness is not of the business itself or of the logistical foundations for sales, but for the attempt to sell a new product. *Coastal Aviation Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1068 (S.D.N.Y.1996).

*8 Fifth and most importantly, and precisely because new ventures lost profits claims must be judged with special scrutiny, that Smiths Report relied on no documentary evidence of any actual sales compelled the Court to exclude this testimony. Under the N.Y.U.C.C., an aggrieved buyer may recover lost profits as consequential damages under section 2–715. *Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1063 (S.D.N.Y.1996). To be recoverable, however, these losses must have been (1) caused by seller's default, (2) contemplated by the parties, and (3) provable with reasonable certainty. *Id.* at 1064. The third element requires that "the damages may not be merely speculative, possible or imaginary, but must be reasonably certain." *Id.* at 1066 (quoting *Kenford Co., Inc. v. Erie County,* 493 N.E.2d 234, 235 (N.Y.1986)). Specifically, "[buyer] must produce some proof that it would have been able to sell [the product] at the purported prices and in the predicted quantity." *Id.* at 1068. Sales records and data are acceptable proof. *Id.* A court should be "hesitant[, however,] to rely on stated assumptions as to the [amount of product] that would have been sold and the prices at which they would have been sold." *Id.* Though lost profits calculations may, in part, rely on assumptions *based on documentary support,* ex-

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
(Cite as: 2010 WL 4892646 (S.D.N.Y.))

perts' opinions on such calculations are excludable when "wrought with unsupported and speculative assumptions" of future prices, sales figures, and transactions undertaken between and individually by the parties with no documentary bases. *Id.* at 1068–70. Indeed, "[t]o award [a buyer] lost profits based on the unproved assumption that it would have sold at list price [all product] it had agreed to purchase would unjustly reward [that buyer] rather than make it whole." *Id.* at 1070.

Here plaintiff offered no documentary evidence establishing that it made even a single sale. At the final pretrial conference the Court asked plaintiff's counsel no fewer than seven times for sales figures, revenue lines, or business ledgers. (Tr. of Hr'g of Oct. 21, 2010 at 32–35.) At best, plaintiff's counsel offered *projections* of sales. (*See Id.* at 32.) Counsel additionally explained that bookkeeping standards and practices in Korea differ from United States standards. (*Id.* at 33.) However, to the Court's simple question of: "What exhibit [does plaintiff] have that establishes the sale?" counsel answered, "Judge, I'm not able to specifically point to any document." (*Id.* at 34.) Furthermore, counsel continued to offer nonresponsive answers to the Court's inquiries into (1) the markup from a $1 per bottle purchase price to a $15 resale price (in other words a markup of fifteen-hundred percent), and (2) the fact that other mineral water was selling in Korea for $0.60 to $1.10. Counsel stated that the sales price used by Smith to calculate lost profits was, unsurprisingly, the plaintiff's sales price. (*Id.* at 38.) And counsel stated that plaintiff's water was priced twenty-five hundred to thirteen-hundred percent higher than other mineral water on the Korean market because its water was matched by "no other water in the world." (*Id.* at 37.) In other words, plaintiff's counsel could, like Smith, point to no documentary evidence attesting to the Report's reliability. With such a lack of foundation, including a lack of any independent research, Smith's Report stood for nothing more than the Court's characterization of it as: "My client tells me I can sell three million bottles and get fifteen dollars a bottle ." (*Id.* at 39.)

*9 If plaintiff were an established company pursuing business for which it had extensive experience or records of sales, Smiths conclusions regarding lost profits might have satisfied reliability. But because (1) the requirements for proving a new ventures economic losses are more strict; (2) the entire predicate for Smiths lost profits opinion was already excluded as unreliable, contradictory, or improper for expert testimony; and (3), the Report was based on no evidence of any actual sales activity; the Court excluded Smiths ultimate opinion that plaintiff lost $133 million in profits due to defendants alleged breach.[FN4]

> FN4. After the Courts decision to preclude Smiths Report, plaintiff moved for reconsideration. Plaintiff argued, again, that an expert may rely on assumptions in reaching his conclusions. Plaintiff also referred the Court to several documents, prepared *after* the events leading to this litigation occurred, purporting to be sales projections. Beyond doubt, an expert may rely on assumptions. The Courts reason for denying Smiths Report was not that it relied on assumptions, but that those assumptions were entirely unfounded and unreliable, and that that reliance was therefore misplaced. Moreover, and as explained more extensively below, the documents provided with plaintiffs motion were themselves unreliable and provided no support for Smiths assumptions. Plaintiff did not identify any controlling law or facts that the Court overlooked in reaching its decision to exclude Smiths testimony. Therefore plaintiffs motion for reconsideration was denied. *See Finkelstein v. Mardkha, 518 F.Supp.2d 609, 611 (S.D.N.Y.2007)*.

**IV. Plaintiffs Exhibit PX 90A.14, Compiled Of Documents Prepared After Litigation Began, Was Excluded**

Plaintiff offered its original exhibit 90A.14 to support its lost profits claim. The exhibit consisted of five pages of documents. The first, bates stamped 165, was a sales plan chart for the years 2006–2010. (Pl.'s Original Trial Ex. 90A.14 at 1 ("Doc.165").) The second, page-numbered 167, purported to be plaintiff's parent company's sales status of purchased mineral water. (*Id.* at 2 ("Doc.167").) The third, page-numbered 166, purported to be plaintiff's sales plan and expenses post–2006. (*Id.* at 3 ("Doc .166").) The fourth, bates stamped 167, was a Korean-language version of Doc. 167; and the fifth, bates stamped 166, was a Korean-language version of Doc. 166. (*See id.* at 4–5.)

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
(Cite as: 2010 WL 4892646 (S.D.N.Y.))

A document prepared after the events leading to the litigation took place, and for litigation purposes, without any independent indication of reliability, is often inherently unreliable and may be excluded. *See Broga v. Northeast Utilities,* 315 F.Supp.2d 212, 228 (D.Conn.2004). Business records specifically, though admissible hearsay, may be excluded when their source, information, or method of preparation appears unreliable. Fed.R.Evid. 803(6).

Doc. 165 was entitled "Sales Plan" and contained a chart of sales numbers, broken down by month, from 2006 through 2010. (Doc. 165.) Because the chart extended at least three years after litigation began, at least the majority of it appeared to be projections or plans, and not records of sales actually made. Furthermore, plaintiff admitted that only half of the 300,000 bottles provided under the contract were actually sold. Thus, the 2006 and 2007 stated sales figures, 1,000,000 and 1,596,672 respectively, must have also been projections rather than records. (*Id.*) Below those numbers, a line of text stated: "ESTIMATED TOTAL LOSS FROM SALES: $ 80,349,304.00". (*Id.*) At trial, out of the jury's presence, the Court questioned plaintiff's counsel as to that bottom line. (Tr. of Trial of October 25, 2010 at 86–87.) Plaintiff's counsel admitted that that line was placed in the document after litigation began, and that the document containing the original chart was not produced. (*Id.* at 87–88.) The Court thus excluded Doc. 165 as unreliable in both that it was prepared after litigation began and in that it appeared to contain no factual matter recording sales that actually occurred.

*10 Doc. 167 was excluded for much the same reasons. Plaintiff's counsel conceded that document was a summary, prepared after litigation began, supposedly based on "voluminous" sales documents that still existed in Korea. (*Id.* at 104–06) This admission was somewhat perplexing considering defense counsel's pre-trial requests, made at least twice in writing, for documents either establishing actual sales or going to plaintiff's damages calculation. (*See* Defendant's First Request For Production Of Documents dated Dec. 27, 2007 ¶ 36; Letter of Defense Counsel Michael J. Stacchini dated Sept. 3, 2008 ¶ 18.) The "voluminous" sales records, however, were never produced. Because Doc. 167 seemed to be a summary, prepared after litigation began, of sales records that themselves clearly would have been responsive to defendant's discovery requests yet were not produced, the Court excluded this document.

Doc. 166 was excluded for the same reasons as Doc. 167. The Court noted additionally, however, that a legal fee figure was written directly on this document under the heading "Expenses." (Tr. of Trial of October 26, 2010 at 106.) When questioned, plaintiff's counsel admitted that that figure represented his fees for this litigation. (*Id.*) Therefore the document, even facially, was prepared after litigation began.

### V. Defendant's Rule 50(a) Motion That Plaintiff Cannot Establish Lost Profits Was Granted

Federal Rule of Civil Procedure 50(a) allows a party to move for judgment as a matter of law on a particular issue. After the opposing party has rested its case, the movant requests a judicial determination that the opposing party cannot make a claim on a specific issue when taking all facts presented by the opposing party as true. Fed.R.Civ.P. 50(a). The court must find that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-movant] on the issue." *Id.*

As stated above, the lost profits of a new business venture must be established with an especially high level of certainty. *Schonfeld,* 218 F.3d at 172 (2d Cir.2000). A plaintiff claiming lost profits must "produce some proof that it would have been able to sell [the product] at the purported prices and in the predicted quantity." *Coastal Aviation,* 937 F.Supp. at 1068. Though records of actual sales can be proof going to lost profits, courts cannot rely merely on assumptions as to sales' quantity and price. *Id.*

Plaintiff could offer no expert testimony going to its lost profits claim. Plaintiff was thus forced to rely on its documentary evidence and its fact witnesses to establish those losses' existence. When offering testimony helpful to the jury and based personal knowledge, company management may express lay opinions regarding the existence and the amount of lost profits. *Barclays Capital Inc. v. Theflyonthewall.com,* 700 F.Supp.2d 310, 342 (S.D.N.Y.2010). At the same time, the witness must be able to point to objective bases for his opinions. *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,* 650 F.Supp.2d 314, 321 n.4 (S.D.N.Y.2009). The Second Circuit has not articulated a clear standard in this regard, but the cases cited, and others, suggest that at a minimum the

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
(Cite as: 2010 WL 4892646 (S.D.N.Y.))

witness must be able to point to some sales data or independent market report indicating that the business venture could make sales and be profitable. Other circuits, moreover, have employed a similar standard. See U.S. Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 689 (8th Cir.2009) (finding no error in the district court's exclusion of the company president's lost profits testimony, based only on the company's own sales projections); Von Der Rurh v. Immtech Int'l Inc., 570 F.3d 858, 861–63, 866 (7th Cir.2009) (finding no error in the district court's exclusion of the company president's lost profits testimony and in that court's preclusion of plaintiff's lost profits theory because the testimony merely stated an expectation of future profits without any data or analysis for support).

*11 Plaintiff's evidence going to lost profits, offered through their witness Jeong Hee Kim, president of the company, consisted of wildly speculative sales projections and was supported neither by data of actual sales nor by independent market research. Kim testified that plaintiff planned to sell its customers each two bottles of $15 mineral water, in a highly competitive market where other mineral water seemed to be selling for between $0.60 and $1.10, every day, apparently *ad infinitum*, by going door-to-door and explaining the waters medicinal properties. (Tr. of Trial of October 26, 2010 at 143–45; Kim. Dep. at 108–12; Pl.'s Original Trial Ex. 90A attach. 5; Pl.'s Trial Ex. 90A.15.) This "plan" served as the basis for all of plaintiff's sales charts and projections. Plaintiff did not, however, provide a single document firmly establishing that it made even one sale. Indeed, as mentioned above plaintiff's counsel admitted he could not "specifically point" to any document confirming a single sale. (Tr. of Hr'g of Oct. 21, 2010 at 34.) Based on this record consisting solely of speculation and projection, the Court could not take as especially certain either the existence or the amount of plaintiff's lost profits. A reasonable jury not having sufficient evidence to find for plaintiff on its lost profits claim, the Court granted defendant's Rule 50(a) motion for judgment as a matter of law on that issue.

Plaintiff pointed the Court to the Wrongdoer Rule. This principle states that a party in breach of contract cannot escape damages because the amount of damages is uncertain. Boyce v. Soundview Tech. Grp. Inc., 464 F.3d 376, 392 (2d Cir.2006); Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926 (2d Cir.1977). When a plaintiff proves a breach and provides a reasonable estimate of the damages that flowed from the breach, the burden is on defendant to overcome any uncertainty and establish a more definite damages amount. Boyce, 464 F.3d at 392. However, in a lost profits scenario, because the existence of damages is in question instead of the amount of damages, the wrongdoer rule applies *only after* plaintiff has established the damages existence with the requisite level of certainty. Schonfeld, 218 F.3d at 174–75. Thus the burden to clarify any uncertainty as to the damages amount would have shifted to defendant if, and only if, plaintiff had established with an especially high level of certainty and based on documentary evidence that it suffered lost profits. See Point Productions A.G. v. Sony Music Entertainment, Inc., 215 F.Supp.2d 336, 346 n.5 (S.D.N.Y.2002). Because plaintiff here had not proved the existence of lost profits, defendant had no burden to clarify those losses amount and the Courts granting of defendants Rule 50(a) motion on lost profits was not disturbed.

### VI. Plaintiffs Application To Seek Lost Sales Damages Was Denied

After ruling that plaintiff was unable to prove lost profits as a matter of law, the Court requested that plaintiff provide a statement of the damages it was still seeking. Plaintiff provided the Court with a Statement and Computation of Damages seeking (1) amounts prepaid under the contract, and (2) a range of *lost sales* between A. $2,494,000.00 for 10 containers ordered through July 2007; or B. $60,000,000.00 for four years of contract term, through this year, at the rate of one million minimum bottles at $15 .00 per bottle. (Pl.s Statement of Damages dated Oct. 28, 2010 at 1 (emphasis in original).)

*12 The Court could find no authority, and plaintiff provided none, stating that lost sales refers to anything different from lost profits or that those concepts would be analyzed in a different manner. Therefore, for the same reasons that the Court precluded plaintiff from seeking lost profits, the Court precluded plaintiff from seeking any damages of lost sales.

### VII. Plaintiff Was Precluded From Seeking To Recover The $500,000 It Claims It Paid To Mr. Young–Gil Jee Pursuant To The Contract

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
**(Cite as: 2010 WL 4892646 (S.D.N.Y.))**

Plaintiff included in its Statement of Damages calculations $2 million for on [sic] money prepaid. (Pl.s Statement of Damages dated Oct. 28, 2010 at 1.) This amount apparently included $1 million plaintiff paid for the right to resell water in Korea.[FN5] Defendant claimed, however, to have received only $500,000 for the distribution right. And plaintiff has represented that it gave a $2 million total payment to one Mr. Young-Gil Jee, an agent of the sole shareholder of plaintiff company. (Compl. in *Ho Myung Moolsan v. Young-Gil Jee,* 07 CV 4004(DMC) (D.N.J.2007) 24.) Plaintiff represented that Jee embezzled the difference of $500,000. (*Id.*)

> FN5. The contract requires plaintiff to pay $500,000 for the right to resell or distribute water in Korea and $1 million as an advance on water shipments. (Def.'s Trial Ex. 1.) In two earlier non-operative versions of the contract (versions signed not by plaintiff and defendant but by defendant and Mr. Jee, an agent of plaintiff company's sole shareholder) the payment for the distribution right was stated first as $500,000, and later as $1 million. (Pl.'s Trial Exs. 3A & 2A.)

The Court ruled that of the $500,000 allegedly stolen by Jee, plaintiff was entitled to no recovery from defendant. The Court allowed testimony concerning the non-operative contracts and transactions made between plaintiff and Jee and between Jee and defendant for background purposes only. (Tr. of Hrg of Oct. 21, 2010 at 27.) The Court stated numerous times that the issue for trial was defendants alleged breach of contract and not the fraud perpetuated by plaintiffs agent. (*Id.* at 25, 27.) Indeed, plaintiffs counsel agreed to offer evidence pertaining to the stolen $500,000 only to show how much value we paid for the water rights. (*Id.* at 19.) And to the Courts statement, [Y]oure not seeking the recover that allegedly fraudulent payment of $500,000 from [defendant], plaintiffs counsel answered, No. (*Id.*)

Moreover, as a matter of law, defendant cannot be held responsible for the stolen $500,000. The current action was for breach of contract. Contract damages are those proximately caused by the breach. In other words, damages, including consequential damages, must be natural and reasonably foreseeable results of the breach. *See Marjan Intl Corp. v. V.K. Putnam, Inc.,* No. 92 Civ. 8531(BN), 1993 WL 541204, at *11 (S.D.N.Y.1993); 24 Williston on Contracts 64:12 (4th ed.).

The contract breach alleged in this case occurred sometime in the early months of 2007. But Jees theft occurred in December 2004. (Compl. in *Ho Myung Moolsan v. Young-Gil Jee,* 07 CV 4004(DMC) (D.N.J.2007) 24.) In other words, the theft occurred over a year before the breach. That the loss of funds due to the theft could have been caused by the breach thus was highly unlikely. Indeed, had the contract never been breached and had these parties never found themselves in litigation, plaintiff would still have lost the stolen $500,000 due to Jees fraud. In other words, the alleged breach of contract had no effect on the loss of the $500,000 in question.

***13** Furthermore, proximate causation requires that the damages be reasonably foreseeable and that imposing liability be fair. *In re Terrorist Attacks on September 11, 2001,* ––– F.Supp.2d –––, No. 03 MDL 1570(GBD), 2010 WL 2484411, at *28 (S.D.N.Y.2010); 24 Williston on Contracts 64:12 (4th ed). To have found defendant liable for any of the missing $500,000 would have been to hold defendant liable for the wrongful actions of the agent of plaintiffs shareholder. But the machinations of plaintiffs owners agent seem entirely unforeseeable to defendant, and indeed perhaps foreseeable to plaintiff. To hold defendant liable for Jees fraud would have been entirely unfair considering both that unforeseeability and that defendant was not implicated in the alleged fraud. Because of that lack of proximate cause, plaintiff could not seek recovery of the $500,000 stolen by Jee from defendant.

**VIII. Plaintiffs Motion To Amend Its Complaint To Include Claims For Fraud In The Inducement And For Negligent Misrepresentation Was Denied**

During trial plaintiff moved under Federal Rules of Civil Procedure 15(a) and 15(b) to amend its complaint to include claims for fraud in the inducement of the contract and for negligent misrepresentation. These proposed amendments were based on certain answers elicited by plaintiff's counsel through his cross examination of defendant's witness Mr. Nam-in Jhon.

As a preliminary matter, plaintiff's motion under Rule 15(a) was denied because that rule only allows amendments proposed before trial begins. Plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
(Cite as: 2010 WL 4892646 (S.D.N.Y.))

motion under Rule 15(b) was also denied. Rule 15(b) reads in pertinent part:

> When an issue not raised by the pleadings is tried by the parties express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.

Fed.R.Civ.P. 15(b)(2). Plaintiff appeared to argue implied consent: this testimony was played out in front of the Court and the jury ..., defendant knew or had to have known [of the testimonys subject matter] ... [and][t]he testimony developed today has always been available to the defendant. (Pl.s Mot. To Amend Its Complaint dated Oct. 27, 2010 at 2–3.) Rule 15(b) motions are intended to correct the theory of an existing claim and not to assert new and different claims. *Timex Licensing Corp. v. Advance Watch Co., Ltd.,* No. 3:07–cv–01731 (VLB), 2010 WL 3169342, at *2 (D.Conn. Aug. 10, 2010). In other words, Rule 15(b) is meant to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record. *Browning Debenture Holders Committee v. DASA Corp.,* 560 F.2d 1078, 1086 (2d Cir.1977). A partys implied consent can be found in, for example, actually litigating an issue, prompting witness testimony on the issue, briefing the issue, or raising the issue at oral argument. *See, e.g., McQueen–Starling v. UnitedHealth Group, Inc.,* 654 F.Supp.2d 154, 168 (S.D.N.Y.2009); *Dickerson v. Napolitano,* 604 F.3d 732, 741 (2d Cir.2010); *Timex,* 2010 WL 3169342, at *3.[FN6]

> FN6. Plaintiff made no claim that defendant *expressly* consented to try the issue and indeed no such consent appears anywhere in the record.

*14 When a partys implied consent is based on evidence presented at trial, that consent requires ongoing discussion of that issue at trial or unobjected introduction of evidence on the point by the opposing party. *Christoforou v. Cadman Plaza North, Inc.,* No. 04 CV 08403(KMW), 2009 WL 723003, at *5 (S.D.N.Y. Mar. 19, 2009). The Second Circuit warns, however, that district courts should be cautious in inferring consent due to notice and procedural due process requirements. *Id.* at *6 (citing *Grand Light Supply Co. v. Honeywell, Inc.,* 771 F.2d 672, 681 (2d Cir.1985)). Thus a partys alleged consent by failure to object only arises when, in addition to being unobjected-to, the issue in question was raised in a sufficiently clear and unambiguous way. *Id.* (citing *Luria Bros. Co. v. Alliance Assurance Co.,* 780 F.2d 1082, 1089–90 (2d Cir.1986)). Consent is not implied through an alleged understanding between the parties or through, for example, statements in responsive Local Rule 56.1 Statements. *Id.* Indeed, a Rule 15(b) motion on a collateral issue based on implied consent is a *narrow exception* to the established procedural principle that a partys failure to include a legal theory ... in the pre-trial order results in its subsequent abandonment or waiver. *Id.* (citing *Kozera v. Intl Bhd. of Elec. Workers, AFL–CIO,* 230 F.Supp.2d 413, 416 n.3 (S.D.N.Y.2002). Presumably, then, an adverse witnesss answer on cross examination, given after an overruled objection, and without any indication whatsoever that the questioning lawyer is raising or intends to raise the unpleaded legal claim, does not operate as a consent to try that issue.

In this case, plaintiffs counsel questioned one of defendants witnesses, Jhon, as to the amount of water defendants factory was producing. (Tr. of Trial of Oct. 27 at 299–301.) The questioning occurred in plaintiffs attempt to prove that defendant breached the contract by failing to fill certain orders. That defendant allegedly made misrepresentations as to the plants capacity at the time the contract was negotiated was neither clearly nor unambiguously raised, nor indeed raised at all either in plaintiff counsels presentation or in the pre-trial order. Thus defendants implied consent was lacking.

The Court denied plaintiffs motion for additional reasons.

First, the factual basis for the claims was flawed. Plaintiff contended these claims arose at trial because Jhon testified to certain factory problems causing defendants production capacity to be limited to approximately 65,000 bottles per month or 780,000 per year. (Pl.s Mot. To Amend Its Complaint dated Oct. 27, 2010 at 2.) This statement arguably gave rise to claims for fraud in the inducement and for negligent misrepresentation because, though plaintiff mentioned it nowhere in the motion, defendant allegedly knew it could not meet the contracts one-million bot-

Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313
(Cite as: 2010 WL 4892646 (S.D.N.Y.))

tle-per-year minimum production requirement. But the contract contained no such requirement for the first year, only for years two through five. Any plant and machinery problems defendant had during the first year of production did not preclude defendants from producing future contract minimums, particularly in light of defendants plans to install a second production line.

*15 Second, no evidence had been presented regarding many of the elements of plaintiffs new claims.[FN7] Accordingly, since plaintiff could not establish a claim of either fraud in the inducement or negligent misrepresentation the amendment would have been futile and was denied for this reason as well. *Ho Myung Moolsan Co. Ltd. v. Manitou Mineral Water, Inc.*, 665 F.Supp.2d 239, 250 (S.D.N.Y.2009).

> FN7. Fraud in the inducement of a contract requires: (1) that the defendant made a representation; (2) as to a material existing fact; (3) which was false; (4) and known to be false by the defendant; (5) that the representation was made for the purpose of inducing the plaintiff to rely upon it; and (6) that the plaintiff reasonably did so rely; (7) in ignorance of its falsity; (8) to his injury. *Rojo v. Deutchsche Bank*, No. 06 Civ. 13574(HB), 2010 WL 2560077 at *4 n .8 (S.D.N.Y. June 23, 2010). Negligent misrepresentation requires that: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. *Travelers Cas. Sur. Co. v. Dormitory Authority-State of New York*, — F.Supp.2d —, No. 07 Civ. 6915(DLC), 2010 WL 3199861, at *8 n.18 (S.D.N.Y. Aug. 11, 2010).

Third, the fraud in the inducement claim had been alleged, and disposed of twice in this litigation. Plaintiff's original complaint contained a claim for fraud in the inducement of the contract based on defendant's representations, made before the contract was executed, "that [defendant] [was] fully capable of providing as much water as plaintiff[ ] required for sale and distribution anywhere including the United States and Korea." (Compl.¶ 44.) Plaintiff claimed then that this was fraud because defendant withheld its knowledge that it "did not have a water production plant that was viable." ( *Id.* ¶ 45.) The Court dismissed the claim because plaintiff failed to plead fraud with the particularity required by Fed.R.Civ.P. 9(b). (Order of Dec. 20, 2007 at 1; Tr. of Conf. of Dec. 20, 2007 at 4.) Thereafter, plaintiff again attempted to plead fraud in the inducement by amending its complaint. By order dated September 29, 2009, Magistrate Judge Pitman denied the motion as futile. Beyond (1) lacking the requisite particularity; (2) failing to show falsity; (3) failing to show reliance; and (4) failing to show damages; the court additionally found that the fraud in the inducement claim was merely a masquerading breach of contract claim. *Ho Myung Moolsan*, 665 F.Supp.2d at 253–54. Plaintiffs final attempt at trial to assert a fraudulent indirect claim fails for the same reasons.

## CONCLUSION
The Court thus disposed of the issues presented above for the reasons stated above.

SO ORDERED.

S.D.N.Y.,2010.
Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.
Not Reported in F.Supp.2d, 2010 WL 4892646 (S.D.N.Y.), 73 UCC Rep.Serv.2d 313

END OF DOCUMENT

Westlaw.

Page 1

Not Reported in F.Supp., 1995 WL 326502 (S.D.N.Y.)
(Cite as: 1995 WL 326502 (S.D.N.Y.))

C
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

PETROLEO BRASILEIRO S.A., PETROBRAS, Plaintiff,
v.
The IBE GROUP, INC., Defendant.

93 CIV. 3305 (TPG).
May 31, 1995.

*OPINION*
GRIESA, District Judge.
  *1 Plaintiff Petrobras entered into a contract to purchase methanol from defendant IBE. Petrobras sues, claiming that IBE breached the contract and failed to deliver the full amount required. IBE denies the breach, and asserts a counterclaim for amounts allegedly owed it by Petrobras.

  Petrobras moves for partial summary judgment, seeking a determination of IBE's liability for breach of contract, leaving damages for trial. Petrobras also moves for summary judgment dismissing the main elements of IBE's counterclaim. Although IBE has made no formal cross-motion for summary judgment, in its papers opposing the Petrobras motions IBE requests summary judgment on its counterclaim.

  The motion of Petrobras for summary judgment determining that IBE is liable for breach of contract is granted. The motion of Petrobras to dismiss part of the counterclaim is granted. IBE's application for summary judgment on its counterclaim is denied.

*FACTS*
  Petrobras was, at the time of the relevant events, the world's largest purchaser of methanol. Petrobras is largely owned by the Brazilian government. IBE is a Delaware corporation with its principal office in New York. IBE is in the business of bartering commodities with the constituent entities of the former Soviet Union.

  The claim of Petrobras arises out of a contract dated September 14, 1992 whereby IBE agreed to make twelve shipments of methanol to Petrobras in Brazil. Only two of the twelve contemplated shipments were made.

  Prior to entering into that contract, the parties had engaged in several "spot" transactions and in one multi-shipment contract. It is necessary to describe the facts about these transactions.

*The Spot Transactions*
  Between November 1991 and March 1992 Petrobras and IBE entered into four separate contracts for single shipments of methanol. In each of these transactions, according to a term stated on IBE'S invoices for each shipment, Petrobras was to make payment by a draft, maturing 60 days from the bill of lading date, to be immediately accepted by Petrobras upon presentation of the shipping documents. Petrobras would be liable for demurrage incurred by IBE. Petrobras would not consider "a claim" (mainly referring to demurrage) if it was asserted after more than 90 days had elapsed from the date of the bill of lading.

  The first shipment, aboard the BOW LION, occurred in November 1991. According to IBE, there were substantial demurrage costs which Petrobras ultimately paid, but only after a two month delay.

  The second shipment, aboard the FOSSANGER, occurred in December 1991. According to IBE, Petrobras did not immediately accept the IBE draft upon presentation of the shipping documents, and in order for IBE to be able to have the cargo delivered on schedule, IBE was required to issue a letter of indemnity to the shipowner, protecting the shipowner in case of a claim for misdelivery.

  The third shipment, aboard the TAMAR SUMMER, occurred in December 1991 without difficulty.

  *2 The fourth shipment, aboard the PETROBULK PANTHER, occurred in March 1992. According to IBE, Petrobras's two day delay in accepting its draft required IBE to issue a letter of indemnity to the shipowner. In addition, due to port congestion, the vessel incurred demurrage costs of $32,987.50. IBE did not present the demurrage claim to Petrobras within 90 days from the date

Not Reported in F.Supp., 1995 WL 326502 (S.D.N.Y.)
**(Cite as: 1995 WL 326502 (S.D.N.Y.))**

of the bill of lading. Petrobras has denied liability. IBE claims the $32,987.50 as part of its counterclaim.

*The Prior Multi-Shipment Contract*

In February 1992 Petrobras and IBE entered into an agreement for the delivery of 54,000 metric tons of methanol, to be shipped in separate lots between April and June 1992. The agreement also called for the delivery of three additional lots at Petrobras's option. The terms of the agreement were substantially the same as in the prior spot transactions.

The first shipment under this contract was on the CHOPIN, and occurred in April 1992. Petrobras delayed three days in accepting IBE's draft, which required IBE to issue a letter of indemnity as before. In addition, Petrobras paid the draft nine days late. This resulted in interest charges incurred by IBE of $3,693.78, which it billed to Petrobras. Petrobras paid $2,336.58 of this interest cost. IBE has not asserted a claim for the balance.

The second shipment was aboard the NCC BAHA, and occurred in June 1992. Petrobras delayed four days in accepting the draft, and a letter of indemnity was issued to the shipowner. In addition, demurrage costs were incurred in the amount of $2,465. IBE did not present the demurrage claim within 90 days from the date of the bill of lading. Petrobras has refused to pay. The $2,465 is part of IBE's counterclaim.

The third shipment was aboard the CHARIOT VENTURE and occurred in July 1992. Due to an eight day delay in accepting IBE's draft, IBE was required to issue a letter of indemnity to the shipowner. Demurrage charges of $62,125 were incurred but were not claimed by IBE within the 90 day period. Petrobras has refused to pay, and IBE has included this amount in its counterclaim.

Apparently Petrobras did not request any of the three optional additional lots provided by for in the contract.

*The Contract In Suit*

The terms of the contract involved in the present case are set forth in a telex from Petrobras to IBE dated September 14, 1992. The contract called for six lots of methanol to be shipped between November 1992 and October 1993 (the "firm shipments), with one to two months separating each shipment. The contract also allowed Petrobras the option of purchasing six additional lots between December 1992 and October 1993. Petrobras was to request a given shipment and IBE was to confirm within 10 days that the shipment would be made. IBE's invoices, which were sent to Petrobras in connection with the two shipments which were made, contained a clause that states "Draft to be immediately accepted by buyer when following documents are presented." The contract provided that IBE must make any claim for demurrage or other matters within 90 days from the bill of lading date.

*3 The parties agree that the contract price turned out to be extremely favorable to Petrobras, and was considerably below the price which prevailed in the market shortly after the contract was entered into.

The first firm shipment under this contract was aboard the STOLT HERON. The vessel was nominated by IBE on October 28, 1993. The vessel sailed on November 18, 1992. The draft and related documents were presented to Petrobras on December 4, 1992, but were not accepted until December 7 or 8, so that IBE was required to issue a letter of indemnity to the shipowner. The draft, for $1,663,560, which was due on January 17 or 18, 1993 was not paid until February 3, 1993. This resulted in interest charges of $6,677.34 to IBE. Both parties now agree that Petrobras paid these interest charges on February 9, 1993, although prior to the filing of papers on the instant motion, IBE contended that these interest charges were never paid by Petrobras. The $6,677.34 was originally part of IBE's counterclaim, but this item has been withdrawn.

On November 17, 1992 Petrobras telexed IBE requesting the second firm shipment and the first additional shipment under the contract. This request was reiterated on November 25, 1992. On December 12, 1992 IBE nominated the CHAMPION VENTURE L as the vessel for the second firm shipment.

On December 21, 1992 Petrobras again requested the first additional shipment, but heard nothing from IBE. On January 13, 1993 there was a third request for this shipment, along with a request for the third firm shipment. On February 3 Petrobras again requested that IBE nominate the vessels for the first additional shipment and the third firm shipment.

IBE responded with a letter dated February 4, 1993. This letter urged IBE to "consider" (1) the "special price" to Petrobras which is "substantially below world market"; (2) Petrobras's repeated delays in accepting IBE's drafts; (3) the fact that Petrobras was late in paying the drafts, causing IBE to incur interest charges; and (4) delays or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 326502 (S.D.N.Y.)
**(Cite as: 1995 WL 326502 (S.D.N.Y.))**

outright refusal to pay some demurrage claims. The letter concluded:

> Taking all the above into context we wish to see Petrobras' performance on acceptance of the draft on the present shipment per the MT CHAMPION VENTURE L, payment of the long delayed demurrage, and settlement of outstanding interest prior to discussing mutually beneficial amendments to the existing contract and shipments thereunder.

On February 8, 1993 IBE presented its draft for the CHAMPION VENTURE L voyage. Petrobras did not accept the draft until February 12, and IBE was required to issue a letter of indemnity to the shipowner. In addition, Petrobras's payment of the $2,177,218.20 draft amount, which was due on March 25 was not made until April 6, or some twelve days late. This resulted in interest charges of $5,624.48 to IBE. Petrobras has refused to pay these interest charges, on the ground that IBE caused the lateness by failing to supply Petrobras with documentation necessary to effectuate payment on time. The $5,624.48 is part of IBE's counterclaim.

*4 IBE incurred demurrage charges of $41,312.50 on the CHAMPION VENTURE L and invoiced Petrobras for this amount on March 5, 1993. Petrobras acknowledged receiving the claim on April 2, and then raised a dispute as to at least part of the claim. Subsequent to the commencement of the present lawsuit, Petrobras paid all of this demurrage charge except for $919.70.

On February 15, 1993 Ivan Da Silva of IBE told Lilian Moura of Petrobras that the price formula needed to be changed, and indicated that obtaining additional cargos would be difficult at the current price level.

On March 8, 1993 Petrobras telexed IBE, noting the failure to provide information about the third firm shipment. Reserving "all our rights" under the contract, Petrobras requested IBE to nominate a vessel for the third firm lot with a loading range of March 25 to April 5.

IBE did not comply with this request. Also, as of this time IBE had not committed to the long-requested first additional shipment.

On April 6 Petrobras telexed IBE, asserting that there had been a continuing course of non-performance which constituted a breach of the contract. The telex demanded that the defaults be cured and stated that if this was not done by April 12, 1993 Petrobras would take all available steps to protect its interest.

IBE replied on April 7, stating that it was Petrobras which was in breach of contract. IBE asserted that shipments had been made promptly until Petrobras failed to meet its payment obligations in a timely manner. IBE complained that Petrobras had not accepted drafts in a timely manner, had not compensated IBE for interest payments, and had failed to satisfy demurrage claims. IBE stated that it was prepared "to discuss additional deliveries to Petrobras" once the breaches of Petrobras were cured.

In a letter dated May 14, 1993 IBE's attorney wrote to Petrobras's attorneys stating that IBE would regard the contract as terminated unless Petrobras cured its "outstanding breaches" by May 31.

No further steps were taken by either side in respect to performance of the contract.

Petrobras filed suit on May 17, 1993. As of this time, as described above, Petrobras had requested the first, second and third firm shipments and the first additional shipment. The first and second firm shipments had been made on the STOLT HERON and the CHAMPION VENTURE L. However, no vessel had been nominated and no delivery made on either the first additional shipment or the third firm shipment, although they were requested by Petrobras on November 17, 1992 and January 13, 1993, respectively. The complaint of Petrobras claimed that IBE'S conduct amounted to a repudiation and breach of the contract with respect to all the unfulfilled deliveries to which Petrobras had a right - the remaining four firm lots and all six additional lots.

As to IBE's counterclaim, the current components of the claim are as follows:

| | |
|---|---:|
| Demurrage on PETROBULK PANTHER | $32,987.50 |
| Demurrage on NCC BAHA | 2,465.00 |
| Demurrage on CHARIOT VENTURE | 62,125.00 |

Not Reported in F.Supp., 1995 WL 326502 (S.D.N.Y.)
**(Cite as: 1995 WL 326502 (S.D.N.Y.))**

| | |
|---|---:|
| Interest for late payment on CHAMPION VENTURE L | 5,624.48 |
| Demurrage on CHAMPION VENTURE L | 919.70 |

## DISCUSSION
*Petrobras's Claim for Breach of Contract*

**\*5** The September 14, 1992 agreement was an installment contract for the sale of goods. After the second firm shipment, IBE did not make any of the further deliveries which it was obligated to make under the contract.

In fact, as of late November 1992 IBE was in default under the contract. Petrobras had requested the second firm shipment and the first additional shipment on November 17, 1992, and under the terms of the contract IBE was required to respond within ten days - *i.e.,* on or before November 27, 1992. IBE did not do so. IBE cured the default on the second firm shipment shortly thereafter by nominating the CHAMPION VENTURE L. However, IBE never nominated a vessel for the first additional shipment.

IBE also defaulted on the January 13, 1993 request for the third firm shipment. IBE never nominated a vessel for that shipment.

IBE's letter of February 4, 1993 noted that IBE's price to Petrobras was substantially below the world market price and went on to note certain alleged deficiencies in performance by Petrobras. IBE made no commitment to further performance of the contract, even if Petrobras's alleged deficiencies were to be remedied, and merely stated that it would be willing to discuss "mutually beneficial amendments to the existing contract." It is clear beyond any question that the overriding desire of IBE was to avoid making sales to Petrobras at the unfavorable price. IBE's letter of April 7, 1993 reiterated the alleged deficiencies, and stated that IBE would "discuss additional deliveries" if the deficiencies were cured.

IBE relies on the provision of the Uniform Commercial Code granting the right to suspend performance and demand assurances when there are reasonable grounds for insecurity about the other party's ability or willingness to perform its obligations. Section 2-609 provides in pertinent part:

> (1) .... When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

IBE contends that Petrobras's deficiencies created reasonable grounds for insecurity on the part of IBE about whether Petrobras would perform its obligations; that IBE's letters of February 4 and April 7 constituted written demands for assurance of due performance; and that Petrobras failed to provide such assurance, thus committing a material breach of contract justifying IBE in terminating its performance. The deficiencies which IBE claims gave rise to its right to resort to this remedy are the ones mentioned in the letters - *i.e.,* (1) Petrobras's lateness in accepting drafts, (2) lateness in paying drafts, causing IBE to incur interest charges, and (3) Petrobras's refusal to pay certain demurrage claims.

Petrobras was in fact three or four days late in accepting the draft on the STOLT HERON and had been four days late in accepting the draft on the CHAMPION VENTURE L. Petrobras was 17 or 18 days late in paying the draft on the STOLT HERON and was 12 days late in paying the draft on the CHAMPION VENTURE L. This resulted in interest charges to IBE of $6,677.34 and $5,624.28. Petrobras reimbursed IBE for the interest charge on the STOLT HERON, but has not done so with respect to the interest charge on the CHAMPION VENTURE L. IBE incurred no demurrage charges on the STOLT HERON, but incurred demurrage on the CHAMPION VENTURE L in the amount of $41,312.50. Petrobras made no payment on the demurrage until after the commencement of the lawsuit, when it paid all but $919.70.

**\*6** The court rejects IBE's argument under § 2-609. It is the view of the court that the deficiencies of Petrobras in no way give IBE reasonable grounds for insecurity as to performance by Petrobras of the essential terms of the contract. During a substantial course of dealings, including the prior spot transactions and the prior installment contract, no problems with Petrobras had ever resulted in a failure by Petrobras to accept delivery of the shipments of methanol and to pay for the methanol which was delivered. Lateness in payment involved a maximum of 18 days.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 326502 (S.D.N.Y.)
(Cite as: 1995 WL 326502 (S.D.N.Y.))

In any event, even if IBE could make out a case of reasonable grounds for insecurity, IBE would also need to show under § 2-609 that it had made a written demand for "adequate assurance of due performance."

IBE contends that its letters of February 4 and April 7 were such written demands. The court disagrees. It is true that IBE stated in the February letter that it wished to see how Petrobras performed on its acceptance of the draft for the CHAMPION VENTURE L, and also sought to have settlement of outstanding interest and demurrage claims. It should be noted that as of February 4, 1993 there was no outstanding demurrage claim related to the September 12, 1992 contract, so that the reference to demurrage related solely to earlier transactions. In any event, the February 4 letter did not state that IBE was seeking assurances from Petrobras *so that IBE could continue with its performance on the contract.* IBE made no commitment whatever to continue with the contract if its requests were met. IBE offered merely to discuss amendments to the existing contract. The April 7 letter was essentially to the same effect, without a firm commitment to comply with IBE's obligations under the contract after appropriate assurances by Petrobras. The April 7 letter merely stated that IBE was prepared to "discuss" additional deliveries. The real problem was the price, as the record conclusively shows.

Thus, neither letter was the kind of written demand required under § 2-609. See *Joqueviel & Cathala v. Eastern Training Co., Inc.,* 1989 WL 119440, *4 (E.D.N.Y.) (under § 2-609 a request must seek assurance of the performance agreed upon in the contract, not performance under new terms). By proposing to amend the existing contract, and by requesting payment of demurrage claims from prior transactions, IBE was posing issues outside the September 14, 1992 contract.

Thus, the court holds that IBE had no right to invoke the remedy of § 2-609 because there was no reasonable ground for insecurity and also because there was no written demand for assurances.

IBE argues in the alternative that it was justified in withholding deliveries under the contract because of Petrobras's lateness in paying the drafts on the shipments. IBE relies on UCC § 2-703, which provides in pertinent part:

Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (Section 2-612), then also with respect to the whole undelivered balance, the aggrieved seller may

*7 (a) withhold delivery of such goods; ...

The following language in § 2-612 expands upon the meaning of "breach ... of the whole contract."
Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole.

Thus, under § 2-703, where a buyer fails to make a payment due, the seller may withhold delivery of the undelivered balance of the goods *only if* "the breach is of the whole contract" - or, as stated in § 2-612, if the failure by the buyer "substantially impairs the value of the whole contract."

It should be noted that the Uniform Commercial Code reflects the common law. Not every deviation from the strict terms of the contract by one party amounts to a breach of the whole contract which gives the other party the right to walk away from the contract. 3A Arthur Linton Corbin, *Corbin on Contracts,* § 659 (1960 and Supp. 1994). This concept is well expressed in *Anheuser-Busch Ice & Cold Storage Co. v. Reynolds,* 222 N.Y.S. 650, 652-653 (1st Dep't 1927):

Assuming the plaintiff to have breached the contract in the respects claimed by the defendant, the question still would remain whether the provisions breached constituted conditions precedent to, or were so material as to prevent, the plaintiff's right to recover the value of the goods sold and delivered to the defendant, or, on the other hand, only gave rise to severable breaches which would permit defendant to counterclaim for his damages.

In the present case, neither lateness of Petrobras in paying drafts nor the other minor deficiencies of Petrobras described above, taken separately or together, constituted a material breach allowing IBE to terminate the contract. These deficiencies did not amount to a breach of the whole contract within the meaning of § 2-703, nor did they substantially impair the value of the whole contract within the meaning of § 2-612. This is especially evident in view of the prior course of dealings between the parties. In the transactions which occurred before the Sep-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 326502 (S.D.N.Y.)
(Cite as: 1995 WL 326502 (S.D.N.Y.))

tember 14, 1992 contract Petrobras was on occasion late in accepting drafts, late in paying drafts (giving rise to relatively small interest charges to IBE), and not forthcoming in paying demurrage. Nevertheless, IBE continued to make shipments to Petrobras, and never treated these problems as sufficient to warrant terminating a given contract or the business relationship. Under the UCC, the prior course of dealings between the parties gives particular meaning to and supplements or qualifies terms of an agreement. UCC § 1-205(3).

*8 Petrobras is seeking summary judgment only on the first three items. These are claims for demurrage on certain transactions which occurred prior to the September 14, 1992 contract. The relevant contracts required IBE to present demurrage claims to Petrobras within 90 days after the date of the bill of lading. In each case IBE failed to do so. Petrobras contends that it is entitled to summary judgment dismissing these demurrage claims.

The only defense of IBE is a claim that the 90-day limit is invalid. IBE contends that the contractual provision improperly shortens the statute of limitations for sales actions provided by the Uniform Commercial Code. Section 2-725 specifies a four year limitation for actions under the UCC, but provides that parties may by agreement reduce the period to not less than one year.

However, the contractual requirement that claims be made to Petrobras within 90 days from the bill of lading date did not shorten the statute of limitations. A statute of limitations deals with the period of time for bringing an action in court. The 90-day claim provision was not a limitation on the time for suing, but merely imposed a requirement that IBE afford Petrobras timely notice of the demurrage claim so that the claim could be verified. Similar clauses are common in the field of insurance. Such clauses are viewed as imposing a valid condition precedent to filing suit on insurance claims. *See, e.g., Utica Mut. Ins. Co. v. Firemen's Fund Ins. Companies,* 748 F.2d 118, 121 (2d Cir. 1984).

It must be concluded that IBE has no defense to Petrobras's claim for breach of the September 14, 1992 contract, and that Petrobras's motion for partial summary judgment on liability should be granted. There is no triable issue of fact on liability. The issue of damages is reserved for trial.

*IBE's Counterclaims*

As already indicated, the current components of IBE's counterclaim are:

| | |
|---|---:|
| Demurrage on PETROBULK PANTHER | $32,987.50 |
| Demurrage on NCC BAHA | 2,465.00 |
| Demurrage on CHARIOT VENTURE | 62,125.00 |
| Interest for late payment on CHAMPION VENTURE L | 5,624.48 |
| Demurrage on CHAMPION VENTURE L | 919.70 |

IBE also argues that the 90-day provision is unconscionable because it is too short. However, IBE accepted the provision knowing full well the time involved in the various stages of these transactions. Moreover, IBE has made no showing of any instance when it was not possible to make the demurrage claim within the required 90 days.

Petrobras is entitled to summary judgment dismissing the first three items of IBE's counterclaim because they involve demurrage claims not presented to Petrobras within the contractual 90-day period.

Petrobras does not seek summary judgment on that portion of the counterclaim relating to the interest paid on the CHAMPION VENTURE L in the amount of $5,624.48 and the small disputed demurrage charge on the CHAMPION VENTURE L in the amount of $919.70. Petrobras concedes that these items will need to be tried along with the issue of damages on the main claim of Petrobras.

As to IBE's request for summary judgment on its counterclaim, this application is denied.

### CONCLUSION

Petrobras is entitled to summary judgment on the issue of liability with regard to its claim for breach of contract. Petrobras is also entitled to summary judgment dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 326502 (S.D.N.Y.)
**(Cite as: 1995 WL 326502 (S.D.N.Y.))**

missing the first three items in IBE's counterclaim relating to demurrage on three voyages occurring prior to the time of the main contract. The issue of damages on the contract claim of Petrobras and the issues raised by the final two items of the IBE counterclaim will require trial, as Petrobras concedes. IBE's application for summary judgment on its counterclaim is denied.

**\*9** SO ORDERED.

S.D.N.Y. 1995
Petroleo Brasileiro S.A., Petrobras v. IBE Group, Inc.
Not Reported in F.Supp., 1995 WL 326502 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.