UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DELL'S MARASCHINO CHERRIES CO., INC.,

               Plaintiff,                           MEMORANDUM AND ORDER

        - against -                          10 Civ. 3789 (ILG) (RER)

SHORELINE FRUIT GROWERS, INC., et al.,

               Defendants.
-------------------------------------------------------x
GLASSER, Senior United States District Judge:

      Plaintiff Dell's Maraschino Cherries Co. Inc. ("Dell's"), a Brooklyn-based producer of maraschino cherries—sweetened brine cherries often found in certain cocktails and on top of ice cream sundaes—on June 23, 2011 filed a second amended complaint against Shoreline Fruit Growers, Inc. ("Shoreline"), a corporation with its principal place of business in Traverse City Michigan, the self-proclaimed "Cherry Capital of the World."  Also named as defendants are several other Michigan-based defendants in the cherry business:  Cherry Ke, Cherries-R-Us, and Great Lakes Packing Co. ("Great Lakes") (together, "defendants").  Dell's asserts claims for a violation of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499(a), et seq., and state law claims for breach of contract and breach of the implied covenant of good faith and fair dealing against Shoreline, as well as state law claims for tortious interference and civil conspiracy against Cherries-R-Us, Cherry Ke, and Great Lakes.  On July 22, 2011, defendants filed an answer to the second amended complaint and Shoreline asserted several affirmative defenses, along with counterclaims for breach of contract and violations of PACA.

All of the parties' claims arise out of an alleged contract between Dell's and Shoreline in which Dell's agreed to purchase 100 truckloads of Michigan brine cherries from Shoreline at a price of $.49 per pound.  Presently before the Court are cross-motions for summary judgment on Dell's claims, Shoreline's counterclaims, and its affirmative defense of commercial impracticability.  For the reasons set forth below, the parties' motions are GRANTED in part and DENIED in part.

## I.  BACKGROUND

Unless otherwise noted, the following facts are undisputed.  Dell's sells finished maraschino cherries to retail and wholesale customers.  Plaintiff's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 dated Mar. 30, 2012 ¶ 1 ("Pl.'s 56.1") (Dkt. No. 75).  Shoreline is an agricultural cooperative that at the time of the parties' dispute was a wholesale seller of brine cherries.  Pl.'s 56.1 ¶ 4;[1] Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 dated Mar. 30, 2012 ¶ 2 ("Defs.' 56.1") (Dkt. No. 80).  Great Lakes, an agent of Shoreline, processes, stores, and packs Shoreline's brine cherries.  Pl.'s 56.1 ¶ 7; Defs.' 56.1 ¶ 9.[2]  Cherry Ke—a wholly-owned subsidiary of Cherries-R-Us, a cherry seller—is a business engaged in

---

[1] Brine cherries are sweet cherries that have been soaked in a salt solution to remove their natural coloring and flavor; maraschino cherries are pitted brine cherries that have been soaked in sweetener, or sometimes alcohol, and food coloring.  See, e.g., Melissa Clark, Cherries' Garish Glory Revived, N.Y. Times, July 18, 2007, http://www.nytimes.com/2007/07/18/dining/18appe.html.

[2] Brine cherries are stored in brine pits—essentially large swimming pools full of brine—that hold anywhere from 200,000 to 300,000 pounds of them; Great Lakes maintains approximately 30 brine pits.  Second Declaration of Robert M. Tata dated Apr. 27, 2012 ("Tata Decl. II") Ex. D (Cullimore Dep.), at 12-13 (Dkt. No. 87).  Processing of cherries entails destemming, sizing, pitting, and weighing the cherries and putting them into containers for sale.  Id. Ex. D (Cullimore Dep.), at 15.

cherry orchard management services.  Defs.' 56.1 ¶¶ 3, 6; Tata Decl. II Ex. C (Veliquette

Dep.), at 326.  Dean Veliquette ("Veliquette") holds key positions within each of the

companies:  he is the "brine cherry manager" of Shoreline, President of Cherries-R-Us,

Vice President and Chairman of the Board of Cherry Ke, and a board member of Great

Lakes.  Affidavit of Dean Veliquette dated Mar. 28, 2012 ("Veliquette Aff.") ¶¶ 1, 10 (Dkt.

No. 81).[3]

On July 13, 2009, Arthur Mondella, Dell's President, entered into a written

contract with Veliquette, the contract's drafter, to purchase 100 truckloads of "Michigan

Brine Cherries (regulars)" at a price of 49 cents per pound, FOB Kewadin, Michigan

from Shoreline (the "contract").  Pl.'s 56.1 ¶¶ 2, 8; Second Amended Complaint dated

June 23, 2011 ("Am. Compl.") Ex. A (Dkt. No. 39).[4]  That price was a record low for

brine cherries.  Declaration of Robert Tata dated Mar. 28, 2012 ("Tata Decl.") Ex. A

(Reidy Dep.), at 19 (Dkt. No. 77).  The contract also included the following provisions:

> Terms:  30 days with credit limit of $130,000
>
> Shipping/Freight/Containers:  Buyer [Dell's] arranges and pays for all
> trucking of cherries.  Shipment of 10/loads per month average.  2008 crop
> shipped until used approximately 10 loads (above and beyond what is
> currently set aside for Dell[']s at Great Lakes Packing Co. per Trudy
> Cullimore).  Start shipping of the 2009 crop no later than October 15,
> 2009 and continue for a 12 month period.  Buyer advises on size and load

---

[3] The Veliquette affidavit is riddled with legal argument.  Placing legal argument in an affidavit is plainly improper, and the Court will only consider the facts in the affidavit that are based on Veliquette's personal knowledge and admissible in evidence.  See, e.g., King v. Pension Trust Fund of Pension, Hospitalization & Benefit Plan of Elec. Indus., No. 01 Civ. 2604 (ILG), 2003 WL 22071612, at *8 (E.D.N.Y. Sept. 5, 2003) (ignoring legal argument in declaration).

[4] A truckload of cherries weighs between 24,000 and 26,000 pounds.  Tata Decl. II Ex. D (Cullimore Dep.), at 28.

> ship dates a minimum of 2 business days ahead of pickup.   Seller
> [Shoreline] agrees to pay freight on bins and barrel return.   Buyer assures
> Seller that the trucks will be fully loaded with bins and/or barrels in bins
> with no charge for empty bins.   Seller to start using Buyer's containers
> when processing starts back up in August 2009.

Am. Compl. Ex. A.  Although Dell's had purchased cherries from Shoreline in the past,

the parties had never before entered into a written contract for 100 loads of cherries.

Second Declaration of Arthur Mondella dated Apr. 26, 2012 ("Mondella Decl. II") ¶ 14

(Dkt. No. 86).  The contract did not require Dell's to purchase cherries exclusively from

Shoreline.  Am. Compl. Ex. A.

   Dell's picked up the first shipment of cherries on October 12, 2009.  Pl.'s 56.1 ¶ 11.

And, in the months that followed, Dell's requested and Shoreline provided cherries in

varying amounts under the contract.  Mondella Decl. II ¶¶ 16, 20.  The parties used both

Dell's and Shoreline's bins to ship the cherries.  Pl.'s 56.1 ¶ 41; Tata Decl. Ex. A (Reidy

Dep.), at 52.  Although Shoreline initially attempted to charge Dell's a "bin rental fee"

for use of its bins, Dell's refused to pay the fee, and Shoreline never again invoiced Dell's

for it.  Id. Ex. A (Reidy Dep.), at 97.

   During the contract's term, Dell's bought cherries from sources other than

Shoreline, sometimes at a price equal to or lower than the contract price of $.49 per

pound.  See, e.g., Mondella Decl. II ¶ 29 ("In January 2010, Dell's started purchasing

cherries from [Traverse Bay Cherry Cooperative]."); Defs.' 56.1 Ex. V (Dell's spreadsheet

indicating that during the term of the contract Dell's purchased cherries from

companies other than Shoreline at or lower than the contract price of $.49 per pound).

   On April 1 2010, Mondella and Veliquette had a telephone conversation

regarding the remainder of loads of cherries due under the contract; Mondella and

Veliquette remember the conversation differently.  Mondella Decl. II ¶ 30; Veliquette Aff. ¶¶ 33-34.  According to Veliquette, Mondella told him Dell's would only take delivery of an additional 35 loads under the contract—an amount that fell short of the 100 truckloads the two had agreed upon.  Veliquette Aff. ¶ 34; Tata Decl. Ex. N (Veliquette Dep.), at 83.  Mondella testified that in response to Veliquette's inquiry to him whether he was going to be able to take the remainder of the loads under the contract, he said that he would.  Tata Decl. Ex L (Mondella Dep.), at 213, 217.  After this conversation, Shoreline began selling its inventory to customers besides Dell's. Veliquette Aff. ¶ 36.

Dell's claims that shortly thereafter, in or around May 2010, Shoreline started restricting Dell's purchase of cherries under the contract.  Declaration of Arthur Mondella dated Mar. 30, 2012 ¶ 11 ("Mondella Decl.") (Dkt. No. 78).  Though Shoreline objects to this characterization of its actions and when they occurred, Defs.' Counterstatement of Material Facts dated Apr. 27, 2012 ¶ 19 ("Defs.'56.1 Opp'n") (Dkt. No. 90),[5] the record is clear that on June 7, 2010, Shoreline communicated to Dell's the

---

[5] Defendants' Rule 56.1 Counterstatement does not fully comply with Local Civil Rule 56.1(d), requiring "each statement controverting any statement of material fact, [to] be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Failure to comply with Local Rule 56.1 permits a reviewing court to consider the facts at issue undisputed for purposes of the motion.  See Fed. R. Civ. P. 56(e)(2); Local Civil Rule 56.1(c); see also T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56. 1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." (citation omitted)).  The Court declines to do so.  Cf. Taylor & Fulton Packing, LLC v. Marco Int'l Foods, LLC, No. 09 Civ. 2614 (ILG), 2011 WL 6329194, at *4 n.2 (E.D.N.Y. Dec. 16, 2011) (noting a court's broad discretion to overlook a failure to comply with Local Civil Rule 56.1).

total number of loads it would make available to Dell's over the next three months:  six

loads in June, six in July, and four in August; it also communicated that the size of the

cherries would likely be only 18-20mm.  Tata Decl. Ex. E (Hicks Dep.), at 48 ("Q.  It says

it will mostly be 18-20s?  A.  Yes.  And the total that you're offering to make available as

of June 7th is six loads in June, six in July, and four in August, correct?  A.  Yes.").

On June 8, 2010, Great Lakes, on behalf of Shoreline, informed Dell's that it

could not meet Dell's request for four loads of 18/20 mm and 20/22 mm cherries.  Id.

Ex. E (Hicks Dep.), at 50-51.  At some point later that month, Mondella called

Veliquette, informing him that Dell's was insisting on delivery of all 100 loads under the

contract.  Tata Decl. Ex. C (Veliquette Dep.), at 88; id. Ex. D (Cullimore Dep.), at 55-56.

On June 25, 2010, Great Lakes employee, Johanna Hicks ("Hicks"), sent an email to

Dell's employee, Mikhail Burlack ("Burlack"), stating, among other things, that

Shoreline would only make 10 loads available to Dell's during July and August.  Id. Ex. E

(Hicks Dep.) Ex. 9 ("Dean says he can make available to you for this July & August

comparable [sic] to what you took last season ten (10) loads.").  After learning of this,

Mondella sent the following message to Hicks:

> Dear Joanna,
>
> Regarding your email to [Mikhail], as far as pricing our contract is still in
> effect for the balance of the 100 containers not delivered.  If you feel you
> cannot fulfill the balance of this contract let me know and I will purchase it
> elsewhere and bill Shoreline the difference.

Id. Ex. E (Hicks Dep.) Ex. 10.  On June 28, 2010, Shoreline reiterated that it would not

accept any more than 10 purchase orders from Dell's and that it would not accept any

more purchase orders until mid-August.  Id. Ex. E (Hicks Dep.), at 62 & Ex. 11.

6

However, at the same time it was refusing to accept additional purchase orders from Dell's, Shoreline was selling cherries to others at a price significantly higher than the Dell's contract rate of $.49 per pound.  Id. Ex. C (Veliquette Dep.), at 443 ("Q. . . . You were taking spot orders though the spring and summer of 2010 to sell cherries that originally had been to—earmarked for Arthur at $.49 a pound, and you sold those for 59 [sic] or $.67 per pound, correct. . . . A.  That's correct."); Tata Decl. II Ex. D (Cullimore Dep.), at 215 ("Q.  And at this time, even though Dean was on notice that Dell's wanted its last 50 truckloads, Dean was releasing cherries to Covita, Kuminiano, Burnette and Cibona at higher prices than the $.49 a pound, wasn't he?  A.  Yes.").

On July 21, 2010, Veliquette sent a memorandum to Mondella, contending that Dell's "ha[d] not acted in accordance with the agreement" in various ways: (1) by failing to provide the bins to be used in shipping the cherries; (2) failing to take delivery of cherries in a timely manner;[6] (3) insisting on a price reduction for the cherries; and (4) exiting the previous year's purchase orders early for the advantage of new, lower pricing on 2009 cherries.  Pl.'s 56.1 ¶¶ 38-39, 45, 49, 53.  Veliquette also stated that Shoreline would provide Dell's an additional 10 loads per month through September 4, 2010.  Mondella Decl. II Ex. C.  Mondella responded in an August 4, 2010 letter to Veliquette that Dell's "will purchase the balance of the fruit stated in our Agreement and on the terms conditions [sic] as stated in the Agreement."  Id. Ex. F.

By letter dated August 9, 2010 to Mondella, Veliquette again accused Dell's of breaching the contract and stated that Shoreline was prepared to sell Dell's eight loads

---

[6] Reidy explained that this "means Dell's did not take the number of loads required under the contract and that Dell's was required to take "[t]en loads [a month] or something very close to that."  Tata Decl. Ex. A (Reidy Dep.), at 52-53.

of brine cherries at a price of $.49 per pound.  Id. Ex. D.  Shortly thereafter, Dell's issued

purchase orders for all of the remaining loads due under the contract, some of which

Shoreline provided.  Id. ¶ 35.  Veliquette by letter dated August 13, 2010 reiterated that

"[w]e would sell you an additional 8 loads at last year's price" plus two additional loads

but rejected Dell's purchase orders for additional loads beyond those ten.  Id. Ex. G

("We are rejecting Purchase Orders 1479 through 1532 for the reasons set forth in my

recent letter to you.  Any additional sales beyond the 10 loads referenced above must be

at 2010 prices.").  When questioned about why he rejected these purchase orders,

Veliquette testified:

> Q.  Let's just break it down.
> A.  I had to reject the [Dell's] purchase orders.  I couldn't—I had to reject
> them.  We had other POs that he had issued earlier that hadn't been filled.
> Q.  Is it your position you just didn't have enough fruit?   Your testimony
> yesterday indicated your—in August I think you had dozens of brine pits
> full of fruit.  You had a warehouse with a million pounds of fruit in it then;
> isn't that correct?
> A.  We did.
> Q.  So you had tons of fruit to satisfy this.
> A.  The availability of the fruit was never the issue.

Tata Decl. Ex. C (Veliquette Dep.), at 435.  He further testified:

> Q.  When I started this questioning, we were asking what happened to the
> million pounds of cherries that were processed in your—brine cherries that
> were processed in your plant in the middle of August.  And what did you
> have, five million pounds of cherries that were out in your brine [p]its
> about that time? . . .
> A.  The cherries in the brine pits would have been the end—end of harvest
> would have been both 2009, 2010.
> Q.  And if you wanted to, in August and September and October, you could
> have used the cherries that were overflowing at your warehouse and in
> your 32 brine pits to satisfy Arthur Mondella's contract at Dell's? . . .
> A.  We had the—we had the cherries."

Id. Ex. C (Veliquette Dep.), at 443-44.

8

During the period of June 2010 through September 2010, Shoreline made available approximately 25 loads of cherries to Dell's at a price of $.49 per pound, and other than $3,367 in freight charges that the parties dispute, Dell's paid Shoreline for all cherries provided under the contract.  Pl.'s 56.1 ¶¶ 27, 78; see also Tata Decl. Ex. C (Veliquette Dep.), at 488 ("Q. . . . Dell's has paid for all the fruit that you've supplied?  A. Yes.").  But even with these additional loads, the 100 load amount provided for in the contract was not fulfilled.  See, e.g., Tata Decl. II Ex. A (Veliquette Dep.), at 91 ("Q.  It's fair to say that [Shoreline] did not deliver a hundred containers to Dell's, correct?  A. That's correct."); Tata Decl. Ex. D (Cullimore Dep.), at 77 ("Q.  And so it's your understanding that 40 or 50 truckload[s] of cherries that were due to be delivered under the contract were not released for delivery; is that correct? . . . The Witness:  That's correct.").

On August 17, 2010, Dell's initiated this action, alleging claims against Shoreline for a violation of PACA, along with state law claims for breach of contract and breach of the covenant of good faith and fair dealing.  After filing the lawsuit, and when it became clear that Shoreline  and Dell's were not going to be able to come to a resolution as to the balance of cherries due under the contract, Dell's in September 2010 purchased cover cherries at a price of $1.02 per pound from a Bulgarian company called Kuminiano Fruit Ltd. ("Kuminiano").  Mondella Decl. II ¶¶ 42-44.[7]

After being granted leave to do so, Dell's on June 23, 2011 filed a second amended complaint, asserting claims for a violation of PACA and state law claims for breach of

---

[7] Defendants dispute whether the cherries from Kuminiano were in fact "cover" cherries.  Reply Affidavit of Dean Veliquette dated May 3, 2012 ¶ 9 ("Veliquette Reply Aff.") (Dkt. No. 95).

contract and breach of the implied covenant of good faith and fair dealing against

Shoreline, as well as state law claims for tortious interference and civil conspiracy

against Cherries-R-Us, Cherry Ke, and Great Lakes.  Defendants on July 22, 2011 filed

their answer, asserting several affirmative defenses, along with counterclaims for breach

of contract and various violations of PACA.  On March 30, 2012, the parties filed cross-

motions for summary.  Dell's seeks summary judgment on its breach of contract and

PACA claims along with Shoreline's commercial impracticability defense and breach of

contract and PACA counterclaims.  Dell's Memorandum of Law in Support of Partial

Summary Judgment dated Mar. 30, 2012 ("Pl.'s Mem.") (Dkt. No. 76).  Defendants seek

summary judgment on all of Dell's claims, as well as Shoreline's counterclaims for

breach of contract and violations of PACA.  Defendants' Memorandum of Law in

Support of Summary Judgment dated Mar. 30, 2012 ("Defs.' Mem.") (Dkt. No. 83).

## II. DISCUSSION

### A.  Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  "'An issue of fact is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  A fact is material if it

might affect the outcome of the suit under the governing law.'" Fincher v. Depository

Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (quoting Roe v. City of

Waterbury, 542 F.3d 31, 35 (2d Cir. 2008)).

The moving party bears the burden of establishing the absence of any genuine

issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.

Ed. 2d 265 (1986).  When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  Id. at 322-23.  To defeat a motion for summary judgment, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), and cannot "'rely on conclusory allegations or unsubstantiated speculation.'" Id. (quoting Fed. Deposit Ins. Corp. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010)).

A court deciding a motion for summary judgment must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quoting Williams v. R.H. Donnelley Corp., 368 F.3d 123, 126 (2d Cir. 2004)).  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)); see also Gottlieb v. Carnival Corp., No. 04 Civ. 4202 (ILG)(VP), 2011 WL 7046904, at *1 (E.D.N.Y. Feb. 1, 2011).

Moreover, in cases such as this one involving the interpretation of contractual terms, summary judgment is appropriate only if the language of the contract is plain and unambiguous, considered in light of the context and structure of the agreement as a whole.  See, e.g., ADP Dealer Servs., Inc. v. Planet Automall, Inc., No. 09 Civ. 0185 (ILG)

(RER), 2012 WL 95211, at *3 (E.D.N.Y. Jan. 12, 2012) (citing Miller Marine Servs., Inc. v. Travelers Prop. Cas. Ins. Co., No. 04 Civ. 5679(ILG), 2005 WL 2334385, at *5 n.3 (E.D.N.Y. Sept. 23, 2005).

"A court faced with cross-motions for summary judgment need not 'grant judgment as a matter of law for one side or the other,' but 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Infanti v. Scharpf, No. 06 Civ. 6552 (ILG), 2012 WL 511568, at *3 (E.D.N.Y. Feb. 15, 2012) (quoting U.S. Bank Nat'l Ass'n v. Ables & Hall Builders, 696 F. Supp. 2d 428, 438 (S.D.N.Y. 2010)).

With all of these principles in mind, the Court first turns to Dell's motion for summary judgment.

## B. Dell's Motion for Summary Judgment

### 1. Dell's Breach of Contract Claim

New York has adopted the Uniform Commercial Code ("U.C.C."), Article 2 of which provides a comprehensive body of rules applicable to "transactions in goods . . . ." N.Y.U.C.C. § 2-102 (McKinney 2012).  It is undisputed that the cherries at issue here are "goods" and thus that Article 2 of the U.C.C. applies.[8]  Pl.'s Mem. at 7; Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment dated Apr. 27, 2012 at 6 ("Defs.' Opp'n") (Dkt. No. 92).  Liability under the U.C.C., as with all breach of contract claims, depends on "(1) the existence of a contract between [plaintiff] and th[e] defendant; (2) performance of the plaintiff's obligations under the contract;

---

[8] Nor do the parties dispute that New York law applies to all of the pendent state law claims.

(3) breach of the contract by th[e] defendant; and (4) damages to the plaintiff caused by th[e] defendant's breach." Diesel Props S.r.l. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011) (citations omitted).

Dell's argues summary judgment is warranted because Shoreline's failure to deliver the 100 truckloads of cherries promised constitutes a breach of the contract and Shoreline had no grounds on which to refuse to fulfill the balance of cherries due under the contract. Pl.'s Mem. at 5-16. Defendants respond that no valid contract between Shoreline and Dell's was ever formed, and that even if it was, it was Dell's that breached the contract, not Shoreline, thus justifying its refusal to make available the additional loads of cherries to Dell's. Defs.' Opp'n at 6-13.[9]

As an initial matter, there is no question that a valid, enforceable contract between Dell's and Shoreline existed. For a contract to exist there must be "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." Express Indus. & Terminal Corp. v. N.Y. State Dep't. of Transp., 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857, 715 N.E.2d 1050 (1999). "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." Id.; see also Leibowitz v. Cornell Univ., 584 F.3d 487, 507 (2d Cir. 2009) ("To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."). Further, with respect to contract formation under the U.C.C., Section 2-204 provides:

---

[9] The parties have also provided briefing on this issue, among others, in their papers in response to defendants' motion for summary judgment. The Court has considered all of the parties' arguments.

(1) A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract. . . .

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

"In a contract for a sale of goods, the essential terms are quantity, price, and time and manner of delivery." DiMare Homestead, Inc. v. Alphas Co. of N.Y., Inc., No. 09 Civ. 6644 (PKC), 2012 WL 1155133, at *24 (S.D.N.Y. Apr. 5, 2012) (citation and internal quotation marks omitted). The signed contract at issue here manifests agreements as to all of these essential terms: the quantity and price was 100 truckloads of brine cherries at a price of 49 cents per pound; as for the time and manner of delivery, the contract called for "shipment of 10/loads per month average" and provided that shipping was to start "no later than October 15, 2009 and continue for a 12 month period." Am. Compl. Ex. A. Moreover, the conduct of the parties demonstrated their recognition of the existence of the contract: Dell's picked up the first shipment of 2009 cherries at Great Lakes on October 12, 2009—before the contractual deadline of October 15, 2009—and Shoreline continued to make loads available to Dell's during the rest of 2009 and into 2010. Pl.'s 56.1 ¶¶ 27-28.[10]

Defendants appear to contend that no contract was formed because there was no meeting of the minds as to whether Dell's had to provide Shoreline with shipping

_____

[10] Notably, defendants' 56.1 Counterstatement acknowledges the existence of the contract. See Defs.'56.1 Opp'n ¶ 8 (admitting Dell's statement that "[o]n July 13, 2009, Dell's entered into a written contact with [Shoreline] to purchase one hundred truck loads of Michigan Brine Cherries (regulars) at 49 cents per pound"); Defs.' 56.1 Opp'n ¶ 59 ("The Contract is the largest, most detailed agreement for the sale of cherries Shoreline has ever entered into.").

containers, the meaning of 10 loads per month average, and whether certain loads exported by Dell's were covered by the contract,[11] Defs.' Opp'n at 6-7; Defs.' Mem. at 8-9, but this contention overlooks the fact that the U.C.C.'s standard for contract formation is quite liberal and does not require every contractual term to be spelled out in detail, with precision, or even to be spelled out at all.  See, e.g., N.Y.U.C.C. § 2-204(3), off. cmt. 3. ("If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy.  The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff.  Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement.").

Indeed, the New York Court of Appeals has emphasized, "[p]ractical business people cannot be expected to govern their actions with reference to nice legal formalisms.  Thus, when there is basic agreement, however manifested and whether or not the precise moment of agreement may be determined, failure to articulate that agreement in the precise language of a lawyer, with every difficulty and contingency considered and resolved, will not prevent formation of a contract." Kleinschmidt Div. of SCM Corp. v. Futuronics Corp., 41 N.Y.2d 972, 973, 395 N.Y.S.2d 151, 363 N.E.2d 701 (1977).  Such basic agreement is manifest in the contract and the parties' subsequent

---

[11] During the winter of 2010, Dell's agreed to export cherries on behalf of Shoreline to growers in South America; Dell's purchased the cherries from Shoreline for $.47 a pound and sold the cherries for $.50 a pound to a Washington-based broker called Dovex that then exported them to South America.  Defs.' 56.1 Ex. M (Mondella Dep.), at 208-11.  The contract contains no provision regarding the export of cherries.

performance under it, and an enforceable agreement between Dell's and Shoreline thus exists.

Defendants' next argument goes to Dell's performance of its obligations under the contract; they contend that Dell's breached the contract—and thus excused Shoreline's non-performance—by: (1) failing to provide Shoreline with necessary containers to ship the cherries in; (2) refusing to purchase cherries under the contract unless Shoreline reduced the price; (3) taking unauthorized deductions from payments owed to Shoreline; and (4) on two occasions failing to make payment to Shoreline within the 30-day payment time limit while over the $130,000 credit limit. Defs.' Mem. at 9; Defs.' Opp'n at 7-8.

Even assuming that these actions constitute uncured breaches of the contract by Dell's, Shoreline's right to be relieved from its obligations under the contract requires a demonstration of a substantial impairment to the contract as a whole. See, e.g., Emanuel Law Outlines, Inc. v. Multi-State Legal Studies, Inc., 899 F. Supp. 1081, 1087 (S.D.N.Y. 1995) (granting plaintiff's motion for summary judgment on breach of contract claim where there was no evidence plaintiff's failure to have goods prepared by promised date substantially impaired the value of entire contract). The parties do not dispute that the contract is an installment contract requiring or authorizing the delivery of goods in separate lots to be separately accepted pursuant to N.Y.U.C.C. § 2-612(1); nor do they dispute that § 2-612(3) applies. Pl.'s Mem. at 14; Defs.' Opp'n at 11. That provision provides:

> Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of

cancellation or if he brings an action with respect only to past installments or demands performance as to future installments.

N.Y.U.C.C. § 2-612(3).  This rule "is designed to further the continuance of the contract in the absence of an overt cancellation," id. § 2-612(3), off. cmt. 6, and "precludes a party from canceling [a] contract for trivial defects."  Emanuel, 899 F. Supp. at 1088.  Shoreline's right to cancel the entire agreement thus depends on whether Dell's alleged breaches substantially impaired the value of the whole contract.  See id.; see also 15 Williston on Contracts § 45-26 (4th ed. 2000) ("[T]he seller must demonstrate that the buyer's breach, such as its failure to pay for one or more installments, substantially impaired the value of the whole contract in order for the seller to refuse to ship any remaining installments and otherwise be relieved of its obligations under the contract.").

Although Shoreline points to several instances in which it contends Dell's allegedly breached the contract, Defs.' Opp'n at 7, it only contends that two of these breaches substantially impaired the entire contract, Defs.' Opp'n at 11-12.  Shoreline contends that Dell's "refusal to supply shipping containers . . . constitutes a substantial impairment of the Contract."  Defs.' Opp'n at 12.  The Court finds this argument unpersuasive.  Although the contract certainly obligated Dell's to provide some of the shipping bins for the cherries, it did not obligate it to provide all of the bins.  Am. Compl. Ex. A ("[Dell's] assures [Shoreline] that the trucks will be fully loaded with bins or barrels in bins with no charge for empty bins.  [Shoreline] to start using [Dell's] containers when processing starts back up in August 2009." (emphasis added)).  Even if it did, however, the record reveals that the parties did in fact use both Dell's and Shoreline's bins; Robert Reidy, Shoreline's treasurer and secretary, acknowledged as

17

much.  See Tata Decl. Ex. A (Reidy Dep.), at 52 ("Q.  [D]uring the course of the contract, [Shoreline] used a combination of both Dell's and its own containers, correct?  A. Yes."); Pl.'s 56.1 ¶ 41.  Accordingly, even if the contract obligated Dell's to provide all of the bins, Shoreline's acquiescence in the parties' course of performance would amount to a waiver of that term.  See N.Y.U.C.C. § 2-208(3) ("[S]uch course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance."); see also Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp., 944 F.2d 1131, 1147 (3d Cir. 1991) (buyer's failure to pay for one installment of goods within 30 days of delivery as required by installment contract did not entitle seller to refuse to make remaining shipments where, among other things, evidence of course of performance showed that the buyer regularly paid for goods up to 90 days after delivery); Petroleo Brasileiro S.A., Petrobras v. IBE Grp., Inc., No. 93 Civ. 3305 (TPG), 1995 WL 326502, at *7 (S.D.N.Y. May 31, 1995) (buyer's lateness in paying drafts and demurrage charges did not substantially impair the value of the whole contract and entitle seller to terminate contract in light of parties' prior course of dealing in which buyer was often late in paying them).[12]

---

[12] Shoreline also argues that it withdrew any waiver of this term in a July 26, 2010 memorandum from Veliquette to Mondella stating that Dell's "fail[ed] to provide containers" for shipping the cherries. Defs.' Mem. at 9; Pl.'s 56.1 ¶ 39.  But the record establishes that, after receiving this memorandum, Dell's complied with the demand. Mondella Decl. ¶ 20; Tata Decl. Ex. A (Reidy Dep.), at 60 ("Q.  And the other condition was that Dell's supply containers, correct?  A.  That I don't recall, but that would make sense.  It was part of the – yes.  Q.  And whatever conditions were imposed, Dell's complied with . . . with respect to the additional loads in August and September of 2010? A. To my knowledge.").

Shoreline also contends Dell's substantially impaired the contract when, according to Veliquette, Mondella told him during a phone call on April 1, 2010 that Dell's would only take delivery of an additional 35 loads under the contract, not the balance of 66 loads required to reach the 100 loads agreed upon.  Defs.' Opp'n at 11. Veliquette testified that during the roughly two and a half minute call, when he asked Mondella how many more loads of cherries he was going to take under the contract and suggested 35, Mondella told him that number was "about right."  Tata Decl. Ex. N (Veliquette Dep.), at 83; see also Veliquette Aff. ¶ 36 ("[W]hen Mondella told me on April 1, 2010 that Dell's would only need thirty-five more loads, I began selling Shoreline's inventory to other customers.").  The first memorialization of this conversation was in a letter dated August 9, 2010 from Veliquette to Mondella that provides in relevant part:

> It certainly appears that Dell's has been purchasing cherries wherever you can get the best price, and as a result we have had to scramble to find other purchasers to mitigate our damages for Dell's failure to take the agreed upon volume.
>
> In light of Dell's breach of contract, I contacted you in April to determine what your intentions were.  At that time, you indicated that you would probably only purchase an additional 35 loads.  In spite of that assurance, Dell's accepted only 3 loads in April, 6 loads in May, 9 loads in June, and 2 loads in July.

Veliquette Aff. Ex. FF (Aug. 9, 2010 Letter), at 1.[13]

---

[13] The contract did not require Dell's to purchase cherries exclusively from Shoreline, Am. Compl. Ex. A, and the record establishes that during the contract's term, Dell's bought cherries from sources other than Shoreline, sometimes at a price equal to or lower than $.49 per pound.  See, e.g., Mondella Decl. II ¶ 29 ("In January 2010, Dell's started purchasing cherries from [Traverse Bay Cherry Cooperative].");  Defs.' 56.1 Ex. V (Dell's spreadsheet indicating that during the term of the contract Dell's purchased

Mondella remembers the conversation differently and testified that in response to Veliquette's inquiry to him whether Dell's was going to be able to take the remainder of the loads under the contract, he said that he would.  Tata Decl. Ex L (Mondella Dep.), at 213, 217; see also Mondella Decl. II ¶ 30 ("In April 2010, I had a conversation with Dean Veliquette, in which I told him that Dell's would take the full 100 loads under the Contract.  At this time, there were approximately 70 loads left to fill.  I completely disagree with Mr. Veliquette's version of this discussion.  I did not learn of Mr. Veliquette's recollection of this conversation until much later when the parties were at issue.").  It thus appears that Mondella first learned of Veliquette's recollection of the April conversation from Veliquette's August 9, 2010 letter to him.

The substance of the April 1 conversation between Mondella and Veliquette is disputed.  A reasonable jury could infer that Mondella told Veliquette that Dell's did not intend to take the full balance of loads due under the contract, thus substantially impairing the contract and relieving Shoreline from its obligations under it.  In light of this factual dispute and because whether a breach of an installment contract "constitutes 'substantial impairment' is a question of fact," Emanuel Outlines, 899 F. Supp. at 1087; see also Williston § 45:24 ("The question whether a nonconformity [or default] . . . impairs the value of the whole contract is, accordingly, one of fact, which will turn upon the particular circumstances in each case and, therefore, will ordinarily preclude

---

cherries from companies other than Shoreline at or lower than the contract price of $.49 cents per pound).

summary judgment."), Dell's motion for summary judgment on its breach of contract claim must be denied.[14]

## 2.  Dell's PACA Claim

Dell's also seeks summary judgment on its PACA claim pursuant to 7 U.S.C. § 499b(2).  "PACA was enacted in 1930 to regulate the interstate sale of perishable agricultural commodities (essentially, fruits and vegetables)."  Taylor & Fulton Packing, 2011 WL 6329194, at *5.  Section 499b(2) provides that it is unlawful "[f]or any dealer to . . . fail to deliver in accordance with the terms of the contract without reasonable cause any perishable commodity bought or sold or contracted to be bought, sold, or consigned in interstate or foreign commerce by such dealer."  7 U.S.C. § 499b(2).[15]  Dell's argues summary judgment is warranted on this claim for the same reason it was warranted on its breach of contract claim—Shoreline, a licensed PACA dealer, failed to provide it with the 100 truck loads of cherries due under the contract.  Pl.'s Mem. at 17-18.  However, because the U.C.C. "applies to sales of produce under PACA, 'where PACA is silent as to

---

[14] The Court does find it curious that after learning that Dell's did not intend to take the full balance of loads under the contract, Shoreline did not demand adequate assurances from Dell's or in any way follow-up with Dell's regarding Mondella's statement.  See N.Y.U.C.C. § 2-609(1) (" When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.").  Also curious is the timing of Veliquette's contention; it was not until August 9, 2010—about a week before Dell's filed suit—that Veliquette first asserted that Mondella told him four months earlier Dell's would take only 35 more loads.  Veliquette Aff. Ex. FF.

[15] The term "perishable agricultural commodity" specifically "[i]ncludes cherries in brine," 7 U.S.C. § 499a(b)(4)(B), and it is undisputed that Shoreline constitutes a licensed "dealer" pursuant to 7 U.S.C. § 499a(b)(6), Pl.'s 56.1 ¶ 5.

a material part of the transaction at issue[,]'" Genecco Produce, Inc. v. Sol Group Mktg.

Co., No. 04 Civ. 6282 (CJS), 2006 WL 328385, at *4 (W.D.N.Y. Feb. 6, 2006) (quoting

Tray-Wrap, Inc. v. Meyer, No. 90 Civ. 7688 (DLC), 1994 WL 710804 at *4 (S.D.N.Y.

Dec. 20, 1994)); Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 709 (2d Cir.

2007) (applying N.Y.U.C.C. in PACA dispute), and because there are factual disputes as

to whether Shoreline was entitled to terminate the contract under the U.C.C., see Part

II.B.1. supra, Dell's motion for summary judgment on its PACA claim is denied as well.

### 3.  Shoreline's Breach of Contract Counterclaims

Dell's next seeks summary judgment with respect to Shoreline's counterclaims

for breach of contract.  Pl.'s Mem. at 18-19.  Shoreline alleges a laundry list of breaches

by Dell's including failing to supply shipping containers; taking unauthorized

deductions for freight charges from remittance monies due Shoreline; and making short

payments.  Answer to Second Amended Complaint and Counterclaim dated July 22,

2011 ("Answer") ¶¶ 36-39 (Dkt. No. 54).[16]  Shoreline seeks damages of $32,259.00 on

---

[16] To the extent Shorelines asserts individual breach of contract counterclaims arising out of alleged breaches by Dell's by (1) informing Shoreline that it would not comply with the terms of the agreement; (2) failing to order the requisite quantities of produce; (3) failing and refusing to make timely or full payments; (4) and failing to timely issue purchase orders; and (5) failing to pick up orders in a timely fashion, Answer ¶¶ 32-35, 37, the Court deems these claims abandoned.  Dell's moved for summary judgment on all of Shoreline's breach of contract counterclaims yet Shoreline only addressed Dell's alleged failure to provide shipping containers, taking unauthorized deductions, and failure to pay storage costs in its papers.  See Defs.' Opp'n at 16. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.  Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003).  In any event, apart from the $32,259.00 that defendants claim is attributable to other contract breaches by Dell's, Shoreline alleges no damages it allegedly suffered as a

these counterclaims, Answer ¶ 40, an amount representing $3,367.00 in unauthorized deductions by Dell's from monies owed to Shoreline, $11,672.00 in short payments in which Dell's allegedly paid Shoreline less than the contractual rate of $.49 per pound, and $17,220.00 in unpaid bin rental fees.  Veliquette Aff. ¶¶ 52-54; Defs.' Opp'n at 16.

Dell's motion for summary judgment on Shoreline's bin rental fee breach of contract claim is granted.  The contract contains no provision regarding bin rental fees, and Veliquette acknowledged as much during his deposition.  See Tata Decl. Ex. C (Veliquette Dep.), at 58 ("Q. . . . It doesn't say you get a bin rental fee, does it?  A.  You're correct."); id. Ex. C (Veliquette Dep.), at 126 ("Q.  But the contract you now admitted has no bin rental fee in it, does it?  A.  That's right."  So you were not entitled to a two and a half cent per pound bin rental fee, were you?  A.  There was a—based on the contract, no.").

As for Shoreline's short payment claim, there was no breach of the contract because the record establishes that Shoreline agreed to the price Dell's paid during the period at issue from March 2010 through July 2010.  Pl.'s 56.1 ¶¶ 50-51.  Indeed, in a July 26, 2010 memorandum to Mondella, Veliquette acknowledges that Shoreline "lowered the price temporarily to $.47/pound."  Defs.' 56.1 Ex. R.  Additionally, though Shoreline maintains that these price reductions were predicated on Dell's paying return freight charges for the cherries, it points to no evidence that establishes the parties came to any agreement with respect to the terms under which the price would be reduced.[17]

_____

result of these breaches.  Indeed, the counterclaim allegations with respect to breach of contract are altogether conclusory.

[17] Shorelines points to a November 20, 2009 email from a Dell's employee to Shoreline suggesting that the parties speak about a price reduction in exchange for

However, summary judgment is denied as to Shoreline's breach of contract claim based on Dell's taking $3,367.00 in unauthorized freight deductions from Shoreline invoices.  The contract provides that Shoreline agreed "to pay freight on bins and barrel return."  Am Compl. Ex. A.  However, because Shoreline refused to pay certain freight charges for the return of Dell's bins to Great Lakes, see, e.g., Tata Decl. Ex. C (Veliquette Dep.), at 463-64; Tata Decl. II Ex. U (Hicks Dep.), at 65-67 & Ex. 13, Dell's paid the freight charges on Shoreline's behalf, and deducted $7,700 from certain payments to Shoreline to cover the cost.  Mondella Decl. ¶ 35.  Shoreline "has acknowledged that it owed Dell's $4,333 of this $7,700, but there is still $3,367 in dispute."  Pl.'s Mem. at 13; see also Tata Decl. Ex. A (Reidy Dep.), at 90 ("Q.  And based on this calculation, Shoreline fruit determined that Dell's owed . . . Shoreline Fruit $3,367.00, correct?  A. That's correct."); Mondella Decl. ¶ 35 ("[T]here is still $3,367.00 in dispute.").  In light of this factual dispute as to Shoreline's entitlement to these funds, Dell's motion for summary judgment as to this claim is denied.

In sum, summary judgment is denied as to the breach of contract counterclaim premised on Dell's allegedly unauthorized deductions for freight and granted as to the remainder of the breach of contract counterclaims.[18]

### 4. Shoreline's PACA Counterclaims

Shoreline's PACA counterclaims are based on Dell's alleged failure to pay Shoreline PACA trust funds in violation of 7 U.S.C. § 499e, Answer ¶ 30, and its failure

---

Dell's paying return freight, Veliquette Aff. Ex. CC, but the record is devoid of any evidence that the parties actually agreed upon such a term.

[18] Shoreline's motion for summary judgment on its breach of contract counterclaims is therefore denied as well.

to issue purchase orders for the cherries Shoreline allegedly set aside for it in violation of 7 U.S.C. § 499b(2).[19]

As an initial matter, summary judgment is denied as to Shoreline's unfair conduct counterclaim. Shoreline's theory appears to be that Dell's violated § 499b(2)[20] when it failed "to order ten loads per month as required by the Contract, and [by] expressly informing Shoreline in April 2010 that would only order thirty-five loads for the balance of the Contract." Defs.' Mem. at 25. Although it is clear the contract did not require Dell's to purchase 10 loads a month but instead "10 loads per month <u>average</u>," Am. Compl. Ex A (emphasis added), meaning that on any given month Dell's could order more or less than 10 loads, summary judgment on the claim must be denied in light of the factual dispute as to whether Mondella on April 1, 2010 told Veliquette that he did not intend to take the full 100 loads under the contract.

As for Shoreline's PACA trust counterclaim, Dell's argues summary judgment is warranted because it is undisputed Shoreline never invoked PACA's statutory trust

---

[19] The Court will refer to the counterclaim brought under 7 U.S.C. § 499e as the "PACA trust counterclaim" and the counterclaim brought under 7 U.S.C. § 499b(2) as the "PACA unfair conduct counterclaim."

[20] Section 499b(2) provides that it is unlawful "[f]or any dealer to reject . . . in accordance with the terms of the contract without reasonable cause any perishable commodity bought or sold or contracted to be bought, sold, or consigned in interstate or foreign commerce by such dealer." 7 U.S.C. § 499b(2). "Reject without reasonable cause" means "(1) [r]efusing or failing without legal justification to accept produce within a reasonable time; (2) advising the seller, shipper, or his agent that produce, complying with contract, will not be accepted; (3) indicating an intention not to accept produce through an act or failure to act inconsistent with the contract; or (4) any rejection following an act of acceptance." 7 C.F.R. § 46.2(bb).

provisions by invoicing Dell's for the trust funds it seeks.  Pl.'s Mem. at 19.  The Court

agrees.

Under PACA's trust provisions, "produce sellers become the beneficiaries of a

constructive, statutory trust that lasts until they get paid.  This trust consists of all

produce-related assets, including produce inventory, receipts, and accounts receivable."

Taylor &  Fulton, 2011 WL 6329194, at *5 (citations omitted).  As a PACA trustee, "a

produce buyer is charged with a duty 'to ensure that it has sufficient assets to assure

prompt payment for produce and that any beneficiary under the trust will receive full

payment.'"  Coosemans, 485 F.3d at 705 (quoting D.M. Rothman & Co. v. Korea

Commer. Bank of N.Y., 411 F.3d 90, 94 (2d Cir. 2005)).  The buyer has a "fiduciary

obligation under PACA to repay the full amount of the debt owed to the PACA

beneficiary."  C.H. Robinson Co. v. Alanco Corp., 239 F.3d 483, 488 (2d Cir. 2001).

Under the statute, the trust is formed at the moment the buyer receives the produce and

remains in effect until the seller is paid in full.  See 7 C.F.R. § 46.46(c)(1); In re

Kornblum & Co., 81 F.3d 280, 286 (2d Cir. 1996).  However, to establish the existence of

a PACA trust, a number of prerequisites must be met:

> [T]he seller must demonstrate that: (1) the commodities sold were
> perishable agricultural commodities; (2) the purchaser of the perishable
> agricultural commodities was a commission merchant, dealer or broker;
> (3) the transaction occurred in interstate or foreign commerce; (4) the
> seller has not received full payment on the transaction; and (5) the seller
> preserved its trust rights by giving written notice to the purchaser of its
> intention to do so.

Taylor & Fulton, 2011 WL 6329194, at *5 (citations omitted).

At issue here is the fifth prerequisite.  Although among the threadbare allegations

in Shoreline's counterclaim, is that it "preserved its interest in the PACA trust by

sending invoices to Plaintiff containing the language required by 7 U.S.C. § 499e(c)(4),"[21] Answer ¶ 28, there is no evidence in the record that Shoreline did so.  In support of its contention, Shoreline points to an invoice dated August 12, 2010 for cherries that it allegedly was not paid for and that contains the required language from § 499e(c)(4), Defs.' Opp'n at 17, but the record is devoid of evidence that this invoice was in fact sent to Dell's.  Mondella Decl. ¶ 45 ("[Shoreline] has never invoiced Dell's the amount of $11,672 to recoup the price deduction.").  Joanna Hicks, the Great Lakes employee responsible for preparing the invoices, testified that she didn't recall whether the invoice was sent to Dell's.  Third Declaration of Robert Tata dated May 4, 2012 Ex. Q (Hicks Dep.), at 84 (Dkt. No. 94).  The same is true of Robert Reidy, Shoreline's treasurer and secretary.  Tata Decl. Ex. A (Reidy Dep.), at 95.  Moreover, Veliquette testified that Dell's paid Shoreline for all cherries that it provided under the contract.  Tata Decl. Ex. C (Veliquette Dep.), at 488.  Accordingly, because there is no evidence in the record that Shoreline has preserved its PACA trust rights, its PACA trust claim fails

---

[21] 7 U.S.C. § 499e(c)(4) provides, in part:

a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph (3) and contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.". [sic]

as a matter of law and Dell's motion for summary judgment on the claim is therefore granted.

In sum, Dell's motion for summary judgment is granted as to Shoreline's PACA trust counterclaim and denied as to its PACA unfair conduct counterclaim.[22]

### 5. Shoreline's Impracticability Defense

Dell's next seeks summary judgment on Shoreline's defense that its performance under the contract was excused on impracticability grounds pursuant to N.Y.U.C.C. § 2-615.  Pl.'s Mem. at 16-17.  Shoreline contends it was excused from providing the balance of cherries due under the contract because it did not have the capacity to fulfill the orders and argues that "Dell's demands would have overwhelmed Shoreline's limited storage and processing capacity, . . . ."  Defs.' Opp'n at 14.

Section 2-615 provides in part:

(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or non-delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

---

[22] Shoreline's motion for summary judgment on its PACA counterclaims is therefore denied as well.

N.Y.U.C.C. § 2-615.  This section "requires a breaching seller to show (1) a contingency (2) the impracticability of performance as a consequence of the occurrence of that contingency, and (3) that the nonoccurrence of the contingency was a basic assumption of the contract."  Canusa Corp. v. A & R Lobosco, Inc., 986 F. Supp. 723, 731 n.6 (E.D.N.Y. 1997) (citation omitted).  Official Comment 4 to this section explains the circumstances under which § 2-615 may be properly invoked:  "a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section." § 2-615, off. cmt. 4.

Although Shoreline makes reference to Section 2-615's standard, it fails to articulate how it has satisfied each of its elements.  And its assertion that it did not have the capacity to fulfill Dell's orders is plainly belied by the record; it is undisputed Shoreline had the cherries in inventory to provide Dell's with the balance of them due under the contract.  Veliquette testified as follows:

> Q.  Let's just break it down.
> A.  I had to reject the [Dell's] purchase orders.  I couldn't—I had to reject them.  We had other POs that he had issued earlier that hadn't been filled.
> Q.  Is it your position you just didn't have enough fruit?   Your testimony yesterday indicated your—in August I think you had dozens of brine pits full of fruit.  You had a warehouse with a million pounds of fruit in it then; isn't that correct?
> A.  We did.
> Q.  So you had tons of fruit to satisfy this.
> A.  The availability of the fruit was never the issue.

Tata Decl. Ex. C (Veliquette Dep.), at 435; see also id. Ex. C (Veliquette Dep.), at 444

("And if you wanted to . . . you could have used the cherries that were overflowing at

your warehouse and in your 32 brine pits to satisfy Arthur Mondella's contract at Dell's?

. . . A.  We had the—we had the cherries.").  Cullimore provided similar testimony.  See

Tata Decl. Ex. D (Cullimore Dep.), at 58-59 ("Q.  [B]etween the cherries in the pit that

you could process and the stored cherries that you had in the plant, do you believe you

had enough cherries to fulfill the Dell's contract as of May or June 2010? . . . A.  Yes.").

Indeed, during the period, Shoreline's sales of brine cherries to other customers—at a

higher price than the contract price with Dell's—continued unabated.  See, e.g., Tata

Decl. Ex. A (Reidy Dep.), at 30-34.  Accordingly, because Shoreline cannot establish that

it can maintain its commercial impracticability defense, Dell's motion for summary

judgment on it is granted.

In sum, Dell's motion for summary judgment is DENIED as to (1) its breach of

contract claim; (2) its PACA claim; (3) Shoreline's unfair conduct PACA counterclaim;

and (4) Shoreline's breach of contract claim premised on Dell's allegedly unauthorized

deductions for freight.  Dell's motion is GRANTED as to (1) the remainder of Shoreline's

breach of contract counterclaims; (2) Shoreline's PACA trust counterclaims; and (3) and

Shoreline's commercial impracticability defense.

## C.  Shoreline's Motion for Summary Judgment

The Court next turns to Shoreline's motion for summary judgment on Dell's

claims and its own counterclaims.  The Court addresses each claim and counterclaim

below.

### 1.  Dell's Breach of Contract and PACA Claims

As discussed in Part II.B.1.-2. <u>supra</u>, there are disputed issues of material fact as to Dell's willingness to perform under the terms of the contract and thus whether Shoreline was entitled to cancel it.  Shoreline's motion for summary judgment on Dell's breach of contract and PACA claims is thus denied.

### 2.  Dell's Claim for Damages Pursuant to U.C.C. §§ 2-711, 2-712, 2-715

Defendants next seek summary judgment with respect to Dell's claim for "cover," incidental, and consequential damages under the U.C.C., contending that even assuming Shoreline breached the contract, Dell's has failed to satisfy the prerequisites to recover under these theories.  Defs.' Mem. at 14.

Section 2-711 of the U.C.C. provides an aggrieved buyer with a number of options where, as here, "the seller fails to make delivery or repudiates."  One of those options is allows the buyer to "'cover' and have damages under [Section 2-712] as to all the goods affected. . . ."  N.Y.U.C.C. § 2-711(1)(a).  Section 2-712 defines "cover" as the "making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."  <u>Id.</u> § 2-712(1).

Section 2-712(2) explains that, after purchasing the substitute goods, the aggrieved buyer may obtain cover damages—the difference between the cost of the substitute goods and the subject contract price—along with any incidental and consequential damages "less expenses saved in consequence of the seller's breach."  <u>Id.</u> § 2-712(2), 2-713(1).  Incidental damages include, among other things, "any commercially reasonable charges, [or] expenses incident" to the breach, and "[c]onsequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had

reason to know and which could not reasonably be prevented by cover or otherwise; . . . ." Id. § 2-715(1)-(2).  Consequential damages, the New York Court of Appeals has explained, "are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed."  Kenford Co. v. County of Erie, 73 N.Y.2d 312, 321, 540 N.Y.S.2d 1, 5 (1989).

Shoreline contends Dell's is not entitled to cover damages and thus that summary judgment is warranted because Dell's cover purchases of cherries from Kuminiano at price of $1.02 per pound were neither made in good faith, nor reasonable, nor made without unreasonable delay.  Defs.' Mem. at 14.  But determinations as to the reasonableness of the parties' actions or their good faith are generally questions of fact for the jury, not the Court, and thus cannot be decided on summary judgment.  Cf. Capital, S.A. v. Lexington Capital Funding III, Ltd., No. 10 Civ. 25 (PGG), 2011 WL 3251554, at *11 (S.D.N.Y. July 28, 2011) (collecting cases and noting that "[w]hether a party to a contract acted in good faith, however, generally presents a question of fact for a jury"); Feinberg v. Katz, No. 01 Civ. 2739 (CSH), 2007 WL 4562930, at *11 (S.D.N.Y. Dec. 21, 2007) ("Whether a party acted with objective reasonableness is a quintessential common law jury question." (citation and quotation marks omitted)).  In any event, fact questions abound.  First, there is competing testimony with respect to bad faith. Shoreline contends Mondella on April 1, 2010 told Veliquette that Dell's would only be taking delivery of 35 more loads but subsequently sent Shoreline purchase orders for the remaining balance of cherries due under the contract; actions, Shoreline maintains, suggest "any purchase of cherries from a source other than Shoreline for the purported purpose of cover was done in bad faith."  Defs.' Mem. at 15.  Mondella testified that he

32

said no such thing and that when Veliquette asked him whether he would take the remainder of the loads under the contract, he said that he would.  Tata Decl. Ex L (Mondella Dep.), at 213, 217.  There are also factual disputes about the reasonableness of the price Dell's paid for the Kuminiano cherries.  Compare Defs.' Mem. at 15 ("In light of the prevailing market for comparable cherries, it was unreasonable for Dell's to pay $1.02 per pound and expect Shoreline to cover the difference.")[23] and Veliquette Reply Aff. Ex. B (Expert Report of Allen Steimel), at 4 ("The Bulgarian [Kuminiano] stem-on cherries should not be used as a measure of price to replace the cherries supplied by Shoreline because they are normally priced well above regulars."), with Tata Decl. II Ex. X (Expert Report of Allan Corradi), at 7 ("Dell's cover price of $1.02 per pound of cherries (delivered) during the Fall of 2010 was commercially reasonable at that time . . . .").  The same is true with respect to the timing of the cover purchases; the parties dispute whether Dell's purchase of the cherries in September was reasonable.  Compare Defs.' Mem. at 16 ("After September 13, 2010, presumably the period when Dell's needed the additional fifty-four loads of fruit, its purchases of cherries from other sources was sporadic at best."), with Mondella Decl. II ¶ 42 ("Dell's realized once and for all in September 2010 that [Shoreline] simply was not going to provide Dell's with the balance of the cherries, despite Dell's filing a lawsuit.  At this time, Dell's had no choice but to cover.").

Shoreline also contends summary judgment is warranted on Dell's claim for incidental and consequential damages pursuant to N.Y.U.C.C. § 2-715.  It argues Dell's

---

[23] Defendants do not cite to their 56.1 Statement or any evidence in support of this assertion but presumably rely upon paragraphs 29 and 30 of their 56.1 Statement.  Defs.' 56.1 ¶¶ 29-30 (discussing range in prices of cherries in brine purchased by Dell's).

claim for incidental damages is not warranted for the same reasons it argues that the cover was untimely, made in bad faith, and unreasonable.  Defs.' Mem. at 16 ("For the reasons set forth above, Dell's cover was not commercially reasonable, and therefore incidental damages must be disallowed.").  In light of the fact questions discussed above with respect to the reasonableness of Dell's cover purchases, the Court rejects this contention, and Shoreline's motion for summary judgment as to Dell's claim for incidental damages is denied.

However, the Court grants defendants' motion for summary judgment as to Dell's claim for consequential damages.  Dell's seeks consequential damages in its second amended complaint, Am. Compl. ¶¶ 40-41, but the specific nature of the consequential damages it seeks is unclear.  Dell's has not identified any damages it considers to be consequential and thus cannot make the required showing that the damages "were fairly within the contemplation of the parties to the contract at the time it was made." Kenford, 73 N.Y.2d at 321 (consequential damages unavailable where there was no provision in contract providing for them and no evidence in record that they were within contemplation of parties prior to or at time of contracting). [24]  Accordingly, Shoreline's motion for summary judgment as to Dell's entitlement to consequential damages pursuant to Section 2-715 is granted.

In sum, defendants' motion for summary judgment is denied as to Dell's claim for cover and incidental damages and granted as to Dell's claim for consequential damages.

---

[24] In any event, Dell's does not address Shoreline's argument as to consequential damages in its papers.  Dell's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment dated Apr. 27, 2012 ("Pl.'s Opp'n") at 21-23 (Dkt. No. 85).

### 3. Dell's Claim for Breach of the Covenant of Good Faith and Fair Dealing

Summary judgment is also granted as to Dell's claim for breach of the covenant of good faith and fair dealing.  Dell's has not opposed Shoreline's motion as to this claim, and the Court therefore deems the claim abandoned.  See, e.g., Taylor, 269 F. Supp. 2d at 265.  In any event, the claim is duplicative of Dell's breach of contract claim; "New York law does not . . . recognize a separate cause of action for breach of the implied covenant of good faith and a breach of contract on the same facts." Fellows v. CitiMortgage, Inc., 710 F. Supp. 2d 385, 407 (S.D.N.Y. 2010) (citing N.Y. Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 770 (1995)).

### 4. Dell's Claim for Conspiracy and Tortious Interference With Contract

Defendants next move for summary judgment on Dell's claims for conspiracy and tortious interference with contract against Great Lakes, Cherries-R-Us, and Cherry Ke. Defs.' Mem. at 19, 22.[25]

"New York does not recognize an independent tort of conspiracy." Kirch v. Liberty Media Corp., 449 F.3d 388, 402 (2d Cir. 2006) (citing Alexander & Alexander of N.Y., Inc. v. Fritzen, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 547, 503 N.E.2d 102 (1986)).  Instead, a civil conspiracy claim must be premised on an independent

---

[25] Dell's has not alleged a claim of tortious interference with prospective contractual relations, so the Court need not address Shoreline's arguments with respect to it.  A valid enforceable contract between Shoreline and Dell's exists, so even if the claim were alleged, it would not be cognizable in any event.  See, e.g., Gortat v. Capala Bros., Inc., No. 07 Civ. 3629 (ILG) (SMG), 2011 WL 6945186, at *4, 6 (E.D.N.Y. Dec. 30, 2011) (tortious interference with prospective contractual relations claim only available in absence of contract).

underlying tort—any "unlawful" act, or a "lawful" act done "in an unlawful manner," Arlinghaus v. Ritenour, 622 F.2d 629, 639 (2d Cir. 1980) (citation omitted)—here, Dell's claim against Great Lakes, Cherry Ke, and Cherries-R-Us for tortious interference with contractual relations.  Accordingly, to establish a civil conspiracy claim, a plaintiff must demonstrate the underlying tort plus three elements: (1) a corrupt agreement; (2) an overt act in furtherance of that agreement; and (3) membership in the conspiracy by each defendant.  Cofacredit v. Windsor Plumbing Supply Co., 187 F.3d 229, 240 (2d Cir. 1999).  "As is true in criminal conspiracies, agreements in civil conspiracies will not easily be shown by direct evidence, but may be inferred from circumstantial evidence." Cofacredit S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 240 (2d Cir. 1999).

A claim of tortious interference with contract "requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." Lama Holding Co. v. Smith Barney, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996).  "[T]o be actionable, the interference must be intentional and not incidental to some other lawful purpose." Heath-Chem Corp. v. Baker, 915 F.2d 805, 809 (2d Cir. 1990) (citing Alvord & Swift v. Stewart M. Muller Constr. Co., 385 N.E .2d 1238, 1241, 46 N.Y.2d 276, 281 (1978)).  Actions taken to protect an economic interest cannot give rise to a tortious interference with contract claim.  Foster v. Churchill, 87 N.Y.2d 744, 750-51, 642 N.Y.S.2d 583, 665 N.E.2d 153 (1996).  However, a plaintiff can overcome the "economic justification" affirmative defense by establishing that the defendant was "motivated by malice or employed illegal means to safeguard its interest." Id. at 750.

36

Apart from the contention that no valid contract between Dell's and Shoreline existed—a contention the Court has already considered and rejected—defendants argue summary judgment on Dell's tortious interference claim is required because there is no evidence in the record to support it.  Defs.' Mem. at 20 ("A further insurmountable barrier to Dell's tortious interference claim is the absence of any evidence supporting it.").

Further, summary judgment on Dell's conspiracy claim is required, defendants maintain, because Dell's has provided no evidence of a corrupt agreement among defendants or any overt act taken by defendants in furtherance of such an agreement. Defs.' Mem. at 22-23.  Dell's responds, among other things, that there is ample evidence in the record to create an issue of fact as to whether Great Lakes, Cherries-R-Us, and Cherry Ke, acting through Veliquette, agreed to and did intentionally procure Shoreline's breach of the contract.  Pl.'s Opp'n at 23-28.  In light of the interwoven nature of the relationship among Great Lakes, Cherries-R-Us, Cherry Ke, Shoreline, and Veliquette—who was intimately involved in the operations of all of the entities—the Court agrees that a reasonable juror could draw such an inference.

For example, the record establishes that Veliquette, Shoreline's president and the contract's drafter, is also the President of Cherries-R-Us and the Vice President and Chairman of the Board of Cherry Ke—a company wholly owned by Cherries-R-Us that also shares office space with it—and the contract was typed up by Cherry Ke's office manager and faxed from Cherry Ke's offices to Dell's.  Tata Decl. Ex. C (Veliquette Dep.), at 39; Tata Decl. II Ex. B (Veliquette Dep.), at 32-33; Veliquette Aff. ¶ 10.  Veliquette testified that he made calls regarding the contract, sent faxes regarding the contract, and

received emails regarding the contract from Cherry Ke.  Tata Decl. II Ex. A (Veliquette

Dep.), at 83-84, 87, 92.  Further, he acknowledged during his deposition that he sent the

July 21, 2010 memorandum to Dell's regarding the Shoreline and Dell's contract dispute

from Cherry Ke's offices.  Id. Ex. A (Veliquette Dep.), at 86-87.

The record also establishes that Veliquette is a board member of Great Lakes, and

that its president is his brother Jon Veliquette.  Tata Decl. II Ex. D (Cullimore Dep.), at

19.  It likewise establishes that in his role as a board member at Great Lakes, Veliquette

often would make decisions regarding the release of cherries to particular customers.

Id. Ex. D, at 21.  Indeed, Trudy Cullimore, Veliquette's sister and Great Lakes' 30(b)(6)

witness, testified that she took "orders" from Veliquette as to whom to deliver cherries

to.  Id. Ex. D, at 59 ("Q.  Now, you say you just took orders from Dean with respect to

who to deliver cherries to and who not to deliver cherries to; is that correct?  A.

Correct.").  She also testified that even after Dell's insisted that Shoreline fulfill the

contract, Veliquette told her to deliver cherries that that would have satisfied Dell's

contract to others.  Id. Ex. D, at 59-60 ("Q.  And during the summer of 2010, after Dean

and you knew that Dell's was insisting that the contract be fulfilled, were there times

when Dean told you to deliver cherries that would satisfy the Dell's contract to other

companies besides Dell's?  A.  Yes.").  All of this evidence is sufficient to create a fact

question for the jury as to whether Great Lakes, Cherries-R-Us, and Cherry Ke through

Veliquette agreed to and did cause Shoreline to breach the contract.  As Dell's aptly

notes:  "[t]here is no dispute that Dean Veliquette was making all of the decisions

regarding [Shoreline's] Contract with Dell's.  The issue for the jury is what 'hat' Dean

Veliquette was wearing when he directed the breach of the Contract." Pl.'s Opp'n at

25.[26]

With respect to Dell's tortious interference claim, defendants' argument that the

economic interest defense applies to them is misplaced. Even assuming defendants did

not waive the defense by failing to put it in their answer, the defense is inapplicable

because it only applies when the alleged interfering parties have acted to protect their

interest in the breaching party's business—here, Shoreline's—not their own. See, e.g.,

UMG Recordings, Inc. v. Escape Media Grp., Inc., — N.Y.S.2d —, 2012 WL 2847859, at

*10 (N.Y. Sup. Ct. 2012) ("[A] party acting in its own direct interest, rather than to

protect its stake in the breaching party, may not raise the economic interest defense."

(citing Wells Fargo Bank, N.A. v. ADF Operating Corp., 50 A.D.3d 280, 281, 855

N.Y.S.2d 68 (1st Dep't 2008)); cf. White Plains Coat & Apron Co., Inc. v Cintas Corp., 8

N.Y.3d 422, 426, 835 N.Y.S.2d 530 (2007) ("In response to [a contract interference]

claim, a defendant may raise the economic interest defense—that it acted to protect its

own legal or financial stake in the breaching party's business." (emphasis added)).[27]

─────────────

[26] Defendants' argument that Dell's conspiracy claim should be dismissed
because it "can offer no proof in admissible form of an agreement to commit conspiracy,
or of any acts taken in furtherance thereof," Defs.' Reply at 11, is unpersuasive. Each of
the defendants was acting through Veliquette, and, as discussed above, there are fact
questions with regard to the nature of the relationship between Veliquette, Great Lakes,
Cherry Ke, and Cherries-R-Us and whether that relationship could be regarded as a
"corrupt agreement." Additionally, many of the actions taken by Veliquette on behalf of
Great Lakes, Cherry Ke, and Cherries-R-Us could be regarded as acts in furtherance of
that agreement.

[27] Defendants appear to rely on Don King Prods., Inc. v. Smith, 47 F. App'x 12, 15
(2002) (summary order) in support of a different proposition—that to invoke the
economic interest defense "it was sufficient that [a defendant] was acting to protect its

Defendants acknowledge that any alleged interference would be in their own interests, not those of Shoreline:

> [I]f Dell's were permitted to force Shoreline to deliver fifty-four purchase orders in one month, Great Lakes would be forced to work day and night, and run it's [sic] machinery and employees to the brink of ruin and exhaustion, if it had any hope, however false, of fulfilling those orders. Similarly, Cherries R Us would have been forced to allow Shoreline to use the more expensive 2010 harvest with which to satisfy Dell's purchase of cherries from the $.49 per pound crop of 2009. Such an outcome would be financially ruinous to those companies, justifying any alleged interference with the Contract.

See Defs.' Mem. at 20.[28]  In sum, defendants' motion for summary judgment as to Dell's conspiracy and tortious interference with contractual relations claims is denied.

## III.   CONCLUSION

For all of the foregoing reasons, Dell's motion for summary judgment is DENIED as to (1) its breach of contract claim; (2) its PACA claim; (3) Shoreline's unfair conduct PACA counterclaim; and (4) Shoreline's breach of contract claim premised on Dell's allegedly unauthorized deductions for freight.  Dell's motion is GRANTED as to (1) the remainder of Shoreline's breach of contract counterclaims; (2) Shoreline's PACA trust counterclaims; and (3) and Shoreline's commercial impracticability defense.

_____

own economic interest in that breaching party." This case is unpublished and of no precedential value.  See White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281, 288 n.1 (2d Cir. 2006) ("The district court relied for authority on a summary order of this Court, see Don King Prods., Inc. v. Smith, 47 Fed. Appx. 12, 15 (2d Cir. 2002) . . . which should not have been cited as precedential authority.").  It also pre-dates the New York Court of Appeals decision in White Plains, which confirmed the scope of the economic interest defense.  See White Plains, 8 N.Y.3d at 426.  Accordingly, to the extent defendants rely on Don King in support of the contention that for the economic interest defense to apply they need only to be acting in their own economic interest, the Court disagrees.

[28] Defendants cite to no record evidence in support of these assertions.

Defendants' motion for summary judgment is DENIED as to (1) Shoreline's counterclaims; (2) Dell's breach of contract, PACA, conspiracy, and tortious interference with contractual relations claims; and (3) Dell's claims for cover and incidental damages under the N.Y.U.C.C.  Defendants' motion is GRANTED as to (1) Dell's claim for breach of the covenant of good faith and fair dealing; and (2) Dell's claim for consequential damages under the N.Y.U.C.C.

Since neither party has provided any legal basis for the award of attorney's fees and costs, each will bear its own.  Finally, the Court declines to enter an order pursuant to Fed. R. Civ. P. 56(g) treating certain facts as established.  See Fed. R. Civ. P. 56(g) advisory committee's note (g) ("Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be established.  The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.").

Ignoring the wise observation of Francis Bacon that "an overspeaking judge is no well-tuned cymbal," I feel constrained to make plain that my determination of the respective parties' motions for summary judgment are in obedience to the law's requirement that I construe the facts in the light most favorable to the non-moving party being ever conscious in doing so, that I make no credibility judgment which, if made, would perhaps dictate a different result.

SO ORDERED.

Dated:      Brooklyn, New York
            August 14, 2012

                                    _____/s/_____
                                    I. Leo Glasser
                                    Senior United States District Judge